

1 MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
2 GRANT L. KIM (CA SBN 114989)
gkim@mofo.com
3 RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
4 MORRISON & FOERSTER LLP
425 Market Street
5 San Francisco, CA 94105
Telephone: (415) 268-7000
6 Facsimile: (415) 268-7522

7 Attorneys for Plaintiff KYPHON INC.

ORIGINAL
FILED

AUG 2 1 2007

R'      . . . . W. WI . . . NG
NORTHERN DISTRICT OF CALIFORNIA

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11

12 KYPHON INC.,

13                  Plaintiff,

14        v.

15 LENNY C. PHAN, an individual,

16                  Defendant.

Case No.

**COMPLAINT FOR PATENT
INFRINGEMENT, BREACH OF
CONTRACT & CONVERSION**

**DEMAND FOR JURY TRIAL**

17

18      Plaintiff Kyphon Inc., for its Complaint, alleges:

**PARTIES**

19

20      1.      Plaintiff Kyphon is a corporation incorporated under the laws of the State of

Delaware with its principal place of business at 1221 Crossman Avenue, Sunnyvale, California

94089.

22      2.      Kyphon is a pioneer in the field of kyphoplasty, a minimally invasive surgical

procedure for repairing spinal fractures.  Such fractures may result from osteoporosis, cancer, or

medical treatments such as chemotherapy.  Balloon kyphoplasty involves the surgical insertion of

a balloon into the fractured bones of the spine to raise them and restore them to their correct

position.  As a result, kyphoplasty can help relieve the significant back pain and stooped posture

that many spinal fracture sufferers experience.

COMPLAINT
sf-2352082

1

3.    Defendant Lenny Chi Phan is a former Kyphon employee.  He previously resided at 1141 Pembroke Drive, San Jose, California 95131, and now resides at 4445 Fairway Drive, Carrollton, Texas 75010.

## JURISDICTION AND VENUE

4.    This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code and for breach of contract and conversion.  This Court has subject matter jurisdiction over the patent infringement claims under 28 U.S.C. § 1331 (federal question) and § 1338(a) (patents).  This Court has subject matter jurisdiction over the breach of contract and conversion claims under 28 U.S.C. § 1367(a) (supplemental jurisdiction) or, alternatively, under § 1332(a)(1) (diversity).

5.    Mr. Phan is subject to personal jurisdiction in this District because he has worked or lived in this District and committed acts of infringement in this District.  Mr. Phan also is subject to personal jurisdiction in this District by express consent.

6.    Venue is proper under 28 U.S.C. § 1391(b)(2) and § 1400(b).

## INTRADISTRICT ASSIGNMENT

7.    Pursuant to Civil L.R. 3-2(c), the Intradistrict Assignment rules do not apply to this Complaint.

## FIRST CAUSE OF ACTION
### (Infringement of U.S. Patent No. 6,607,544)

8.    Kyphon is the owner by assignment of all rights, title, and interest in and to United States Patent No. 6,607,544 ("the '544 patent"), issued on August 19, 2003 and entitled "Expandable Preformed Structures for Deployment in Interior Body Regions."  The '544 patent is attached as Exhibit A.

9.    Mr. Phan is infringing or has infringed the '544 patent directly or indirectly under 35 U.S.C. § 271 by making, using, offering for sale, or selling products for use in performing kyphoplasty.  Mr. Phan's products encompass an invention claimed by the '544 patent or are a substantial part of such an invention.  Mr. Phan's products are specially made or adapted for use in an invention claimed by the '544 patent and are not staple articles or commodities of commerce

suitable for substantial non-infringing uses. Upon information and belief, Mr. Phan knowingly and actively has instructed or continues to instruct purchasers in the use of his products in a manner that infringes or would infringe the '544 patent.

10.    Mr. Phan's infringement is without the consent or other authority of Kyphon. Mr. Phan is not licensed under the '544 patent.

11.    On information and belief, Mr. Phan has infringed or is infringing the '544 patent with knowledge of Kyphon's patent rights and despite an objectively high likelihood that his actions constituted infringement. Mr. Phan's infringement of the '544 patent has been and continues to be willful.

12.    Kyphon is entitled to damages for Mr. Phan's infringement of the '544 patent and trebled damages for Mr. Phan's willful infringement of the '544 patent.

13.    Kyphon has no adequate legal remedy. Unless enjoined by this Court, Mr. Phan will continue his acts of infringement to Kyphon's substantial and irreparable harm. Under 35 U.S.C. § 283, Kyphon is entitled to an injunction barring Mr. Phan from further infringement of the '544 patent.

## SECOND CAUSE OF ACTION

(Infringement of U.S. Patent No. 6,623,505)

14.    Kyphon is the owner by assignment of all rights, title, and interest in and to United States Patent No. 6,623,505 ("the '505 patent"), issued on September 23, 2003 and entitled "Expandable Structures for Deployment in Interior Body Regions." The '505 patent is attached as Exhibit B.

15.    Mr. Phan is infringing or has infringed the '505 patent directly or indirectly under 35 U.S.C. § 271 by making, using, offering for sale, or selling products for use in performing kyphoplasty. Mr. Phan's products encompass an invention claimed by the '505 patent or are a substantial part of such an invention. Mr. Phan's products are specially made or adapted for use in an invention claimed by the '505 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing uses. Upon information and belief, Mr. Phan knowingly

1  and actively has instructed or continues to instruct purchasers in the use of his products in a

2  manner that infringes or would infringe the '505 patent.

3       16.    Mr. Phan's infringement is without the consent or other authority of Kyphon.

4  Mr. Phan is not licensed under the '505 patent.

5       17.    On information and belief, Mr. Phan has infringed or is infringing the '505 patent

6  with knowledge of Kyphon's patent rights and despite an objectively high likelihood that his

7  actions constituted infringement. Mr. Phan's infringement of the '505 patent has been and

8  continues to be willful.

9       18.    Kyphon is entitled to damages for Mr. Phan's infringement of the '505 patent and

10  trebled damages for Mr. Phan's willful infringement of the '505 patent.

11       19.    Kyphon has no adequate legal remedy. Unless enjoined by this Court, Mr. Phan

12  will continue his acts of infringement to Kyphon's substantial and irreparable harm. Under 35

13  U.S.C. § 283, Kyphon is entitled to an injunction barring Mr. Phan from further infringement of

14  the '505 patent.

15                          **THIRD CAUSE OF ACTION**

16                   (Infringement of U.S. Patent No. 6,979,341)

17       20.    Kyphon is the owner by assignment of all rights, title, and interest in and to United

18  States Patent No. 6,979,341 ("the '341 patent"), issued on December 27, 2005 and entitled

19  "Expandable Preformed Structures for Deployment in Interior Body Regions." The '341 patent is

20  attached as Exhibit C.

21       21.    Mr. Phan is infringing or has infringed the '341 patent directly or indirectly under

22  35 U.S.C. § 271 by making, using, offering for sale, or selling products for use in performing

23  kyphoplasty. Mr. Phan's products encompass an invention claimed by the '341 patent or are a

24  substantial part of such an invention. Mr. Phan's products are specially made or adapted for use

25  in an invention claimed by the '341 patent and are not staple articles or commodities of commerce

26  suitable for substantial non-infringing uses. Upon information and belief, Mr. Phan knowingly

27  and actively has instructed or continues to instruct purchasers in the use of his products in a

28  manner that infringes or would infringe the '341 patent.

1    22.    Mr. Phan's infringement is without the consent or other authority of Kyphon.

2    Mr. Phan is not licensed under the '341 patent.

3    23.    On information and belief, Mr. Phan has infringed or is infringing the '341 patent

4    with knowledge of Kyphon's patent rights and despite an objectively high likelihood that his

5    actions constituted infringement.  Mr. Phan's infringement of the '341 patent has been and

6    continues to be willful.

7    24.    Kyphon is entitled to damages for Mr. Phan's infringement of the '341 patent and

8    trebled damages for Mr. Phan's willful infringement of the '341 patent.

9    25.    Kyphon has no adequate legal remedy.  Unless enjoined by this Court, Mr. Phan

10   will continue his acts of infringement to Kyphon's substantial and irreparable harm.  Under 35

11   U.S.C. § 283, Kyphon is entitled to an injunction barring Mr. Phan from further infringement of

12   the '341 patent.

13                              **FOURTH CAUSE OF ACTION**

14                                    (Breach of Contract)

15   26.    Mr. Phan was Kyphon employee between April 2000 and March 2005.

16   27.    On April 5, 2000, Mr. Phan executed a Proprietary Information Agreement.  Under

17   paragraph 2(a) of the Proprietary Information Agreement, Mr. Phan agreed that, "at all times

18   during the term of my employment and thereafter, [he would] hold in strictest confidence, and not

19   . . . use, except for the benefit of the Company, or . . . disclose to any person, firm or corporation

20   without written authorization of the Board of Directors of the Company, any Confidential

21   Information of the Company."  The Proprietary Information Agreement is attached as Exhibit D.

22   28.    On February 22, 2005, Mr. Phan tendered his resignation, effective March 1, 2005.

23   On February 28, 2005, Mr. Phan agreed that he would "preserve as confidential all trade secrets,

24   confidential knowledge, data or other proprietary information relating to products, processes,

25   know-how, designs, formulas, developmental or experimental work, computer programs, data

26   bases, other original works of authorship, customer lists, business plans, financial information or

27   other subject matter pertaining to any business of the Company or any of its employees, clients,

28   consultants or licensees."  The Termination Certification is attached as Exhibit E.

COMPLAINT                                                                                      5
sf-2352082

29.     Notwithstanding the explicit terms of the Proprietary Information Agreement and Termination Certification, Mr. Phan has breached the Proprietary Information Agreement by disclosing confidential information concerning Kyphon and its kyphoplasty products to others, including Peter Kyone Park and individuals in the Republic of Korea, without authorization.

30.     As a result of Mr. Phan's breach of contract, Kyphon has suffered and will continue to suffer damages.

## FIFTH CAUSE OF ACTION

### (Conversion)

31.     During his employment with Kyphon, Mr. Phan knowingly and intentionally converted all or parts of Kyphon's bonding and balloon machines and other components used to manufacture Kyphon's kyphoplasty products by removing them from Kyphon's premises. Mr. Phan has used the materials he converted to manufacture kyphoplasty machines, devices, or components for companies other than Kyphon.

32.     Mr. Phan's 's conversion of Kyphon's property has interfered with Kyphon's rights to this property.  Mr. Phan's conversion was performed without Kyphon's express or implied authorization.

33.     As a result of Mr. Phan's conversion of Kyphon's property, Kyphon has suffered and will continue to suffer damages.

WHEREFORE, Kyphon requests judgment:

A.     Declaring that Mr. Phan has infringed the '544, '505, and '341 patents;

B.     Declaring that Mr. Phan has breached the Proprietary Information Agreement with Kyphon;

C.     Declaring that Mr. Phan has converted Kyphon's property;

D.     Preliminarily and permanently enjoining Mr. Phan and his employees, agents, servants, or any other person or entity acting in privity or in concert with him from further infringement of the '544, '505, and '341 patents;

1    E.    Preliminarily and permanently enjoining Mr. Phan and his employees, agents,

2          servants, or any other person or entity acting in privity or in concert with him from

3          disclosing Kyphon's confidential information to unauthorized parties;

4    F.    Ordering Mr. Phan to return the property that he removed from Kyphon's premises

5          without authorization;

6    G.    Awarding Kyphon its damages, together with pre-judgment interest and costs, for

7          Mr. Phan's infringement of the '544, '505, and '341 patents, and increasing said

8          damages by up to three times under 35 U.S.C. § 284;

9    H.    Awarding Kyphon its damages, together with pre-judgment interest and costs, for

10         Mr. Phan's breach of his agreements with Kyphon;

11   I.    Awarding Kyphon its damages, together with pre-judgment interest and costs, for

12         Mr. Phan's conversion of Kyphon's property;

13   J.    Declaring this to be an exceptional case under 35 U.S.C. § 285;

14   K.    Awarding Kyphon its reasonable attorneys' fees, costs, and disbursements in this

15         action, with interest; and

16   L.    Awarding Kyphon such other and further relief as this Court may deem just and

17         proper.

18   Dated: August 21, 2007                MICHAEL A. JACOBS
                                           GRANT L. KIM
19                                         RICHARD S.J. HUNG
                                           MORRISON & FOERSTER LLP
20

21

22                                         By: _____
                                               Richard S.J. Hung
23                                             Attorneys for Plaintiff

24

25

26

27

28

COMPLAINT                                                                              7
sf-2352082

1

## DEMAND FOR JURY TRIAL

2     Kyphon Inc. demands a trial by jury of any and all issues triable of right by a jury in the

3 above-captioned action.

4

5 Dated: August 21, 2007

MICHAEL A. JACOBS
6                                                         GRANT L. KIM
RICHARD S.J. HUNG
7                                                         MORRISON & FOERSTER LLP

8

By: _____
9                                                         Richard S.J. Hung

10                                                        Attorneys for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
sf-2352082

8



(12) **United States Patent**
Boucher et al.

(10) Patent No.: **US 6,607,544 B1**
(45) Date of Patent: **\*Aug. 19, 2003**

(54) **EXPANDABLE PREFORMED STRUCTURES FOR DEPLOYMENT IN INTERIOR BODY REGIONS**

(75) Inventors: **Ryan P Boucher**, San Francisco, CA (US); **Mark A Reiley**, Piedmont, CA (US); **Robert M Scribner**, Los Altos, CA (US); **Karen D Talmadge**, Palo Alto, CA (US)

(73) Assignee: **Kyphon Inc.**, Sunnyvale, CA (US)

( \* ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/420,529**

(22) Filed: **Oct. 19, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/088,459, filed on Jun. 1, 1998, now abandoned, which is a continuation-in-part of application No. 08/788,786, filed on Jan. 23, 1997, now Pat. No. 6,235,043, which is a continuation of application No. 08/188,224, filed on Jan. 26, 1994, now abandoned.

(51) Int. Cl.[7] .............................................. **A61B 17/56**

(52) U.S. Cl. ...................... **606/192**; 606/53; 604/96.01

(58) Field of Search .............................. 606/60, 61–75, 606/86–89, 190, 191, 192, 194, 53; 604/96.01

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,849,002 A | 8/1958 | Oddo |
| 3,154,077 A | 10/1964 | Cannon |
| 3,640,282 A | 2/1972 | Kamen et al. |
| 3,648,294 A | 3/1972 | Shahrestani |
| 3,850,176 A | 11/1974 | Gottschalk |
| 3,889,685 A | 6/1975 | Miller, Jr. et al. |
| 4,261,339 A | 4/1981 | Hanson et al. |
| 4,292,974 A | 10/1981 | Fogarty et al. |
| 4,327,736 A | 5/1982 | Inoue |
| 4,338,942 A | 7/1982 | Fogarty |
| 4,402,307 A | 9/1983 | Hanson et al. |
| 4,467,790 A | 8/1984 | Schiff |
| 4,531,512 A | 7/1985 | Wolvek et al. |
| 4,848,344 A | \* 7/1989 | Sos et al. ................... 128/344 |
| 4,917,088 A | 4/1990 | Crittenden |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 274 411 | 7/1988 |
| EP | 0 597 465 | 9/1988 |
| EP | 0 135 990 | 9/1990 |
| EP | 0 410 072 | 1/1991 |
| EP | 0 436 501 | 4/1993 |
| EP | 0 420 488 | 7/1993 |
| EP | 0 439 202 | 9/1993 |
| EP | 0 592 885 | 9/1993 |
| EP | 0 318 919 | 1/1994 |
| EP | 0 383 794 | 6/1994 |
| EP | 0 355 937 | 11/1995 |
| EP | 0 713 712 | 5/1996 |
| EP | 0 730 879 | 9/1996 |
| EP | 0 531 117 | 1/1997 |
| EP | 0 362 826 | 5/1997 |
| EP | 0 566 684 | 6/1997 |
| EP | 0 779 062 | 6/1997 |
| EP | 0 826 395 | 3/1998 |

*Primary Examiner*—David O. Reip

(74) *Attorney, Agent, or Firm*—Ryan Kromholz & Manion, S.C.

(57) **ABSTRACT**

An expandable structure made from an elastomer material is preformed to a desired geometry by exposure to heat and pressure. The structure undergoes controlled expansion and further distention in cancellous bone, with controlled deformation and without failure.

11 Claims, 5 Drawing Sheets



# US 6,607,544 B1
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,969,888 | A | 11/1990 | Scholten et al. |
| 4,983,167 | A | 1/1991 | Sahota |
| 5,102,390 | A | 4/1992 | Crittenden et al. |
| 5,104,376 | A | 4/1992 | Crittenden |
| 5,108,404 | A | 4/1992 | Scholten et al. |
| 5,295,994 | A | 3/1994 | Bonutti |
| 5,352,199 | A | 10/1994 | Tower |
| 5,415,635 | A | 5/1995 | Bagaoisan et al. |
| 5,587,125 | A | 12/1996 | Roychowdhury |
| 5,766,151 | A * | 6/1998 | Valley et al. ................. 604/96 |
| 5,827,289 | A * | 10/1998 | Reiley et al. ................. 606/86 |
| 5,938,582 | A * | 8/1999 | Ciamacco, Jr. et al. ......... 600/3 |
| 5,972,015 | A | 10/1999 | Scribner et al. |
| 6,048,346 | A | 4/2000 | Reiley |
| 6,066,154 | A | 5/2000 | Reiley et al. |
| D439,980 | S | 4/2001 | Reiley et al. |
| 6,235,043 | B1 | 5/2001 | Reiley et al. |
| 6,241,734 | B1 | 6/2001 | Scribner et al. |
| 6,248,110 | B1 | 6/2001 | Reiley et al. |
| 6,379,373 | B1 | 4/2002 | Sawhney et al. |
| 6,383,212 | B2 | 5/2002 | Durcan et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 834 293 | 4/1998 |
| WO | WO89/02763 | 4/1989 |
| WO | WO91/17788 | 11/1991 |
| WO | WO92/11892 | 7/1992 |
| WO | WO92/19440 | 11/1992 |
| WO | WO94/02197 | 2/1994 |
| WO | WO95/20362 | 8/1995 |
| WO | WO95/22367 | 8/1995 |
| WO | WO96/04951 | 2/1996 |
| WO | WO96/12516 | 5/1996 |
| WO | WO96/39970 | 12/1996 |
| WO | WO97/03716 | 2/1997 |
| WO | WO97/17098 | 5/1997 |
| WO | WO97/17099 | 5/1997 |
| WO | WO97/40877 | 11/1997 |
| WO | WO98/03218 | 1/1998 |
| WO | WO 98/56301 | 12/1998 |
| WO | WO 99/29246 | 6/1999 |
| WO | WO 00/37212 | 7/1999 |
| WO | WO 99/51149 | 10/1999 |
| WO | WO 99/62416 | 12/1999 |
| WO | WO 01/28439 | 4/2001 |
| WO | WO 01/76514 | 10/2001 |

* cited by examiner

*FIG. 1*



*FIG. 2*







*FIG. 9*



*FIG. 10*





FIG. 11



FIG. 12

US 6,607,544 B1

1

# EXPANDABLE PREFORMED STRUCTURES FOR DEPLOYMENT IN INTERIOR BODY REGIONS

## RELATED APPLICATION

This application is a continuation-in-part of U.S. patent application Ser. No. 09/088,459, filed Jun. 1, 1998, now abandoned.

This application is also a continuation-in-part of U.S. patent application Ser. No. 08/788,786, filed Jan. 23, 1997, now U.S. Pat. No. 6,235,043, which is a continuation of U.S. patent application Ser. No. 08/188,224, filed Jan. 26, 1994 (now abandoned).

## FIELD OF THE INVENTION

The invention relates to expandable structures, which, in use, are deployed in interior body regions of humans and other animals.

## BACKGROUND OF THE INVENTION

The deployment of expandable structures, generically called "balloons," into cancellous bone is known. For example, U.S. Pat. Nos. 4,969,888 and 5,108,404 disclose apparatus and methods using expandable structures in cancellous bone for the fixation of fractures or other osteoporotic and non-osteoporotic conditions of human and animal bones.

## SUMMARY OF THE INVENTION

When deployed in cancellous bone, expandable structures should undergo expansion and distention without failure. Furthermore, such structures, when distended, should generally match the geometry of the interior bone space in which the structure is deployed. In addition, such structures should permit compaction of areas of lowest bone density. Exposure to cancellous bone also typically requires materials having resistance to surface abrasion and/or tensile stresses.

It is has been determined that expandable structures incorporating elastomer materials, e.g., polyurethane, which have been preformed to a desired shape, e.g., by exposure to heat and pressure, can undergo controlled expansion and further distention in cancellous bone, without failure, while exhibiting resistance to surface abrasion and puncture when contacting cancellous bone.

Features and advantages of the inventions are set forth in the following Description and Drawings, as well as in the appended Claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a coronal view of a vertebral body;

FIG. 2 is a lateral view of the vertebral body shown in FIG. 1;

FIG. 3 is a plan view of a tool which carries at its distal end an expandable structure that embodies features of the invention;

FIG. 4 is an enlarged view of the proximal end of the tool shown in FIG. 3, showing the handle and connected luer fittings;

FIG. 5 is an enlarged view of the distal end of the tool shown in FIG. 3, showing the expandable structure;

FIG. 6 is a plan view of the tool shown in FIG. 3, also showing a stylet that can be inserted into the tool to straighten the expandable structure during deployment in bone;

2

FIG. 7 is an enlarged view of the distal end of the tool shown in FIG. 3, also showing an insertion sleeve that can be used to compact the expandable structure prior to insertion into a cannula;

FIG. 8 is a top view of a mold forming the expandable structure shown in FIG. 5;

FIG. 9 is a coronal view of the vertebral body shown in FIG. 1, with the tool shown in FIG. 3 deployed to compress cancellous bone as a result of inflating the expandable structure;

FIG. 10 is a coronal view of the vertebral body shown in FIG. 9, upon removal of the tool, showing the cavity formed by the compression of cancellous bone by the expandable structure;

FIG. 11 is an enlarged view of the expandable structure shown in FIG. 5, diagrammatically showing the expansion characteristics of the structure; and

FIG. 12 is a graph which plots the effects of increasing pressure applied to the interior of the structure to the expanded volume of the structure.

The invention may be embodied in several forms without departing from its spirit or essential characteristics. The scope of the invention is defined in the appended claims, rather than in the specific description preceding them. All embodiments that fall within the meaning and range of equivalency of the claims are therefore intended to be embraced by the claims.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The preferred embodiment describes improved systems and methods that embody features of the invention in the context of treating bones. This is because the new systems and methods are advantageous when used for this purpose. However, aspects of the invention can be advantageously applied for diagnostic or therapeutic purposes in other areas of the body.

The new systems and methods will be more specifically described in the context of the treatment of human vertebra. Of course, other human or animal bone types can be treated in the same or equivalent fashion.

### I. Anatomy of a Vertebral Body

FIG. 1 shows a coronal (top) view of a human lumbar vertebra 12. FIG. 2 shows a lateral (side) view of the vertebra 12. The vertebra 12 includes a vertebral body 26, which extends on the anterior (i.e., front or chest) side of the vertebra 12. The vertebral body 26 is shaped generally like a marshmallow.

As FIGS. 1 and 2 show, the vertebral body 26 includes an exterior formed from compact cortical bone 28. The cortical bone 28 encloses an interior volume of reticulated cancellous, or spongy, bone 32 (also called medullary bone or trabecular bone).

The spinal canal 36 (see FIG. 1), is located on the posterior (i.e., back) side of each vertebra 12. The spinal cord (not shown) passes through the spinal canal 36. The vertebral arch 40 surrounds the spinal canal 36. Left and right pedicles 42 of the vertebral arch 40 adjoin the vertebral body 26. The spinous process 44 extends from the posterior of the vertebral arch 40, as do the left and right transverse processes 46.

It may be indicated, due to disease or trauma, to compress cancellous bone within the vertebral body. The compression,

US 6,607,544 B1

3

for example, can be used to form an interior cavity, which receives a filling material, e.g., a flowable material that sets to a hardened condition, like bone cement, allograft tissue, autograft tissue, hydroxyapatite, or synthetic bone substitute, as well as a medication, or combinations thereof, to provide improved interior support for cortical bone or other therapeutic functions, or both. The compaction of cancellous bone also exerts interior force upon cortical bone, making it possible to elevate or push broken and compressed bone back to or near its original prefracture, or other desired, condition.

## II. Tool for Treating Vertebral Bodies

FIGS. 3 to 5 show a tool 48 for accessing bone for the purpose of compacting cancellous bone. The tool 48 includes a catheter tube assembly 10. The distal end of the catheter tube assembly 10 carries an expandable structure 56. In use, the structure is deployed and expanded inside bone, e.g., in the vertebral body 26 shown in FIGS. 1 and 2, to compact cancellous bone 32, as will be described later.

As best shown in FIGS. 4 and 5, the catheter tube assembly 10 includes an outer catheter body 16 and an inner catheter body 18, which extends through the outer catheter body 16. The proximal ends of the outer and inner catheter bodies 16 and 18 are coupled to a y-shaped adaptor/handle 14 (as FIG. 4 shows).

As FIG. 5 shows, the expandable structure 56 is coupled at its proximal end to the distal end of the outer catheter body 16. Likewise, the expandable structure is coupled at its distal end to the distal end of the inner catheter body 18.

The outer catheter body 16 defines an interior lumen 20 (see FIGS. 4 and 5), through which the inner catheter body 18 extends. In use, the interior lumen 20 conveys a pressurized liquid, e.g., sterile water, radiopaque fluid (such as CONRAY™ solution, from Mallinkrodt, Inc., or an other fluid into the structure 56, to expand it.

A first female-to-male luer fitting 22 is secured to the handle 14 and serves, in use, to couple the interior lumen 20 to a source of pressured liquid.

As FIGS. 4 and 5 also show, the inner catheter body 18 defines an interior lumen 24, which passes concentrically through the interior lumen 20 of the outer catheter body 16. In use, the interior lumen 24 can serve to convey a flushing liquid, e.g., sterile saline, for discharge through an opening 30 at the distal end of the inner catheter body 18.

A second female-to-male luer fitting 34, which is joined to the inner catheter body 18, is also secured to the handle 14. If desired, the second female-to-male luer fitting 34 can serve to couple the interior lumen 24 to a source of flushing liquid. In addition, the interior lumen 24 of the inner catheter body 18 can accommodate passage of a stylet 38 (see FIG. 6). The distal end of the stylet 38 is preferably radiused, to prevent puncture of the inner catheter body 18.

As FIG. 6 shows, the stylet 38 desirably carries a screw cap 50, which when attached to the second luer fitting 34, holds the stylet 38 in place within the inner catheter body 18. In the illustrated embodiment, the proximal end of the inner catheter body 18 includes a flared region 52 (see FIG. 4) where it joins the second luer fitting 34. The flared region 52 allows smooth insertion of the stylet 38, free of interference or contact with the peripheral edge of the inner catheter body 18.

When the cap 50 is screwed into the second luer fitting 34, the stylet 38 desirably extends through the entire interior lumen 24 of the inner catheter body 18. In the illustrated

4

embodiment, the opening 30 at the distal end of the inner catheter body 18 is sized to block passage of the stylet 38 beyond the distal end of the inner catheter body 18. Thus, when inserted through the interior lumen 24 and locked to the handle 14 with the screw cap 50, the stylet 38 desirably abuts against the distal end of the structure 56. The presence of the stylet 38 desirably prevents the structure 56 from bunching or deflecting when the structure 56 is inserted into the cannula 78 and/or bone.

The tool 48 also includes an insertion sleeve 54 (see FIG. 7). The insertion sleeve 54 is carried for sliding movement along the outer catheter body 16. The insertion sleeve 54 slides forward over the structure 56 (shown in phantom lines in FIG. 7), to protect and compress the structure 56 during its insertion into the cannula 78. Once the structure 56 is deployed into the cannula 78, the insertion sleeve 54 slides aft away from the structure 56 (shown in solid lines in FIG. 7), and can, if desired, engage the handle 14.

Various materials can be selected for the component parts of the tool 48. Furthermore, the dimensions of the component parts of the tool 48 can also vary, according to its intended use. The following table lists preferred component materials and dimensions, which are well suited for a tool 48 that can be deployed for use in a vertebral body:

| Component | Material | Dimension (Inches) |
|---|---|---|
| Outer catheter body 16 | 99% TEXIN ® 5270 Polyurethane 1% Titanium Dioxide (Colorant) | Outside Diameter: 0.102 Inside Diameter: 0.078 |
| Inner catheter body 18 | A Blend Comprising: 25% TEXIN ® 5286 Polyurethane 75% TEXIN ® 5270 Polyurethane | Outside Diameter: 0.063 Inside Diameter: 0.043 |
| Expandable Structure | TEXIN ® 5286 Polyurethane | As Formed: Axial Length (From Distal End of Outer Catheter Tube to Distal end of Inner Catheter Tube): 0.949 Compressed Diameter: 0.160" Non-Expanded Diameter: 0.270" |
| Tool | | Total End to End Length: 15.75 |
| Stylet | Stainless Steel | Outside Diameter: 0.038 |
| Insertion sleeve 54 | PEBAX ® Tubing | Outside Diameter: 0.195 Inside Diameter: 0.160 Length: 1.5 |

The blend of polyurethane materials for the inner catheter body 18 desirably enhances the strength of the distal bond between the inner catheter body 18 and the structure 56, due to the presence in both components of the common TEXIN® 5286 Polyurethane material. This improved bond allows the length of the distal bond to be reduced without sacrificing bond integrity. In addition, because both the inner catheter body 18 and the structure 56 are clear plastic, visual inspection of the distal bond area is simplified.

The component parts of the tool 48 can be formed and assembled in various ways. A preferred assembly will now be described.

A. The Expandable Structure

The material from which the structure 56 is made should possess various physical and mechanical properties to optimize its functional capabilities to compact cancellous bone. The three most important properties are the ability to expand

5

6

its volume; the ability to deform in a desired way when expanding and assume a desired shape inside bone; and the ability to withstand abrasion, tearing, and puncture when in contact with cancellous bone.

### 1. Expansion Property

A first desired property for the structure material is the ability to expand or otherwise increase its volume without failure. This property enables the structure 56 to be deployed in a collapsed, low profile condition subcutaneously, e.g., through a cannula, into the targeted bone region. This property also enables the expansion of the structure 56 inside the targeted bone region to press against and compress surrounding cancellous bone, or move cortical bone to a prefracture or other desired condition, or both.

The desired expansion property for the structure material can be characterized by ultimate elongation properties, which indicate the degree of expansion that the material can accommodate prior to failure. Sufficient ultimate elongation permits the structure 56 to compact cortical bone, as well as lift contiguous cortical bone, if necessary, prior to wall failure. Desirably, the structure 56 will comprise material able to undergo an ultimate elongation of at least 50%, prior to wall failure. when expanded outside of bone. More desirably, the structure will comprise material able to undergo an ultimate elongation of at least 150%, prior to wall failure, when expanded outside of bone. Most desirably, the structure will comprise material able to undergo an ultimate elongation of at least 300%, prior to wall failure, when expanded outside of bone.

### 2. Shape Property

A second desired property for the material of the structure 56 is the ability to predictably deform during expansion, so that the structure 56 consistently achieves a desired shape inside bone.

The shape of the structure 56, when expanded in bone, is desirably selected by the physician, taking into account the morphology and geometry of the site to be treated. The shape of the cancellous bone to be compressed, and the local structures that could be harmed if bone were moved inappropriately, are generally understood by medical professionals using textbooks of human skeletal anatomy along with their knowledge of the site and its disease or injury, and also taking into account the teachings of U.S. patent application Ser. No. 08/788,786, filed Jan. 23, 1997, and entitled "Improved Inflatable Device for Use in Surgical Protocol Relating to Fixation of Bone," which is incorporated herein by reference. The physician is also desirably able to select the desired expanded shape inside bone based upon prior analysis of the morphology of the targeted bone using, for example, plain film x-ray, fluoroscopic x-ray, or MRI or CT scanning. The expanded shape inside bone is selected to optimize the formation of a cavity that, when filled with a selected material, provides support across the region of the bone being treated. The selected expanded shape is made by evaluation of the predicted deformation that will occur with increased volume due to the shape and physiology of the targeted bone region.

In some instances, it is desirable, when creating a cavity, to also move or displace the cortical bone to achieve the desired therapeutic result. Such movement is not per se harmful, as that term is used in this Specification, because it is indicated to achieve the desired therapeutic result. By definition, harm results when expansion of the structure 56 results in a worsening of the overall condition of the bone and surrounding anatomic structures, for example, by injury to surrounding tissue or causing a permanent adverse change in bone biomechanics.

As one general consideration, in cases where the bone disease causing fracture (or the risk of fracture) is the loss of cancellous bone mass (as in osteoporosis), the selection of the expanded shape of the structure 56 inside bone should take into account the cancellous bone volume which should be compacted to achieve the desired therapeutic result. An exemplary range is about 30% to 90% of the cancellous bone volume, but the range can vary depending upon the targeted bone region. Generally speaking, compacting less of the cancellous bone volume leaves more uncompacted, diseased cancellous bone at the treatment site.

Another general guideline for the selection of the expanded shape of the structure 56 inside bone is the amount that the targeted fractured bone region has been displaced or depressed. The controlled deformation diameter expansion of the structure 56 within the cancellous bone region inside a bone can elevate or push the fractured cortical wall back to or near its anatomic position occupied before fracture occurred. Generally speaking, inadequate compaction of cancellous bone results in less lifting of contiguous cortical bone.

For practical reasons, it is desired that the expanded shape of the structure 56 inside bone, when in contact with cancellous bone, substantially conforms to the shape of the structure 56 outside bone, when in an open air environment. This allows the physician to select in an open air environment a structure having an expanded shape desired to meet the targeted therapeutic result, with the confidence that the expanded shape inside bone will be similar in important respects.

An optimal degree of shaping can be achieved by material selection and by special manufacturing techniques, e.g., thermoforming or blow molding, as will be described in greater detail later.

### 3. Toughness Property

A third desired property for the structure 56 is the ability to resist surface abrasion, tearing, and puncture when in contact with cancellous bone. This property can be characterized in various ways.

One way of measuring a material's resistance to abrasion, tearing and/or puncture is by a Taber Abrasion test. A Taber Abrasion test evaluates the resistance of a material to abrasive wear. For example, in a Taber Abrasion test configured with an H-18 abrasive wheel and a 1 kg load for 1000 cycles (ASTM Test Method D 3489), Texin® 5270 material exhibits a Taber Abrasion value of approximately 75 mg loss. As another example, under the same conditions Texin® 5286 material exhibits a Taber Abrasion value of approximately 30 mg loss. Typically, a lower Taber Abrasion value indicates a greater resistance to abrasion. Desirably, the structure will comprise material having a Taber Abrasion value under these conditions of less than approximately 200 mg loss. More desirably, the structure will comprise material having a Taber Abrasion value under these conditions of less than approximately 145 mg loss. Most desirably, the structure will comprise material having a Taber Abrasion value under these conditions of less than approximately 90 mg loss.

Another way of measuring a material's resistance to abrasion, tearing and/or puncture is by Elmendorf Tear Strength. For example, under ASTM Test Method D 624, Texin® 5270 material exhibits a Tear Strength of 1,100 lb-ft/in. As another example, under the same conditions, Texin 5286 exhibits a Tear Strength of 500 lb-ft/in. Typically, a higher Tear Strength indicates a greater resistance to tearing. Desirably, the structure will comprise material having a Tear Strength under these conditions of at

7

least approximately 150 lb-ft/in. More desirably, the structure will comprise material having a Tear Strength under these conditions of at least approximately 220 lb-ft/in. Most desirably, the structure will comprise material having a Tear Strength under these conditions of at least approximately 280 lb-ft/in.

Another way of measuring a material's resistance to abrasion, tearing and/or puncture is by Shore Hardness. For example, under ASTM Test Method D 2240, Texin® 5270 material exhibits a Shore Hardness of 70D. As another example, under the same conditions, Texin® 5286 material exhibits a Shore Hardness of 86A. Typically, a lower Shore Hardness number on a given scale indicates a greater degree of elasticity, flexibility and ductility. Desirably, the structure will comprise material having a Shore Hardness under these conditions of less than approximately 75D. More desirably, the structure will comprise material having a Shore Hardness under these conditions of less than approximately 65D. Most desirably, the structure will comprise material having a Shore Hardness under these conditions of less than approximately 100A.

It should be noted that a structure incorporating a plurality of materials, such as layered materials and/or composites, may possess significant resistance to surface abrasion, tearing and puncture. For example, a layered expandable structure incorporating an inner body formed of material having a Taber Abrasion value of greater than 200 mg loss and an outer body having a shore hardness of greater than 75D might possess significant resistance to surface abrasion, tearing and puncture. Similarly, other combinations of materials could possess the desired toughness to accomplish the desired goal of compressing cancellous bone and/or moving cortical bone prior to material failure.

4. Creating a Pre-Formed Structure

The expansion and shape properties just described can be enhanced and further optimized for compacting cancellous bone by selecting an elastomer material, which also possess the capability of being preformed, i.e., to acquire a desired shape by exposure, e.g., to heat and pressure, e.g., through the use of conventional thermoforming or blow molding techniques. Candidate materials that meet this criteria include polyurethane, silicone, thermoplastic rubber, nylon, and thermoplastic elastomer materials.

As described earlier, in the illustrated embodiment, TEXIN® 5286 polyurethane material is used. This material is commercially available from Bayer in pellet form.

The pellets can be processed and extruded in a tubular shape using, e.g., a screw type (888 4:1) extrusion machine, with a GENCA™ head, with a single finger spider and a 80–100–200 screen. The following table summarizes representative process settings for the extrusion.

| Extrusion Element | Nominal Setting |
|---|---|
| Die | 0.338" |
| Mandrel | 0.180" |
| Zone 1 Set/Actual | 270 degrees F |
| Zone 2 Set/Actual | 370 degrees F |
| Zone 3 Set/Actual | 380 degrees F |
| Melt Temperature | 405 degrees F |
| Clamp Set/Actual | 370 degrees F |
| Adaptor Set/Actual | 380 degrees F |
| Die 1 Set/Actual | 380 degrees F |
| Die 2 Set/Actual | 380 degrees F |
| Extruder | 1600 RPM |
| Barrel | 1600 PSI |
| Motor | 5 Amps |

8

| -continued | |
|---|---|
| Extrusion Element | Nominal Setting |
| Mandrel Air | 2" of water |
| Entry Hole Diameter | 0.3" |
| Bath Dist. from Tooling | 1" |
| Water Flow/Temperature | 6 GPH/70 degrees F |
| Air Wipe | 20 PSI |
| Speed | 21.5 FPM |
| Min Dryer Time/Temperature | Overnight/160 degrees F |

The ultimate dimensions of the tubular extrusion can vary, according to the desired size and shape of the structure 56. In a representative embodiment, the tubular extrusion has an outside diameter of 0.164", and inner diameter of 0.092", and a wall diameter of 0.36". Reasonable processing tolerances can of course be established

The tubular extrusion is cut into individual lengths for further processing. The tube length can vary, according to the desired configuration of the structure 56. In a representative embodiment, each tube is cut to a length of about 48" for further processing.

The structure 56 is formed by exposing a cut tube length 60 to heat and then enclosing the heated tube 60 within a mold 58 while positive interior pressure is applied to the tube length 60. The mold 10 can be part of a conventional balloon forming machine, such as the Model No. 9608C made by Interface Associates.

As FIG. 8 shows, the mold 58 includes a tube holding channel 62, through which the tube length 60 extends for processing. The holding channel 62 includes a formed intermediate cavity 64, which possesses a desired geometry. The cavity 64 defines the geometry intended for the structure 56.

In the illustrated embodiment, the cavity 64 possesses two enlarged cavity spaces 92 and 94 with an intermediate channel 96. The dimensions of the spaces 92, 94 and channel 96 can, of course, vary according to the desired dimensions of the structure 56.

In a representative embodiment, each enlarged cavity space 92 and 94 extends 0.395" on each side of the center line 66. The maximum diameter of each cavity space 92 and 94 is 0.314", and the maximum diameter for the spacing channel 96 is 0.174". Desirably, all surfaces within the mold 58 are radiused to provide a smooth transition.

Prior to heating, one end of the tube length 60 is attached to a source of pressurized air, e.g., nitrogen. The other end of the tube length 60 is gripped and closed. The tube is desirably subjected to a tensioning force (e.g., 16 oz).

The tube length 60 is then subjected to a heating cycle. During the heating cycle, the tube length 60 is heated to a predetermined heated temperature for a set dwell time. The heated temperature and dwell time are selected to soften the tube length 60 for subsequent stretching and pressure shaping.

The range of heated temperatures in which softening occurs will depend upon the particular composition of the polymeric material used. For example, for the polyurethane tube of the dimensions described above, a heated temperature of 290 degrees F. and a dwell time of 220 seconds can be used. An operating range of softening temperatures for a given plastic material can be empirically determined. Suitable processing tolerances can also be empirically established.

When the heating cycle ends, the heat-softened tube length 60 is stretched by pulling it a set amount. The stretching desirably reduces the thickness of the tube walls.

US 6,607,544 B1

9

10

In a representative embodiment, the tube is stretched approximately 0.198" to each side. The amount of stretching is selected to facilitate shaping without significantly reducing the resistance of the material, once shaped, to puncture.

The mold 58 then closes over the heated and stretched tube length 60. Pressurized air (typically, nitrogen) is introduced through the interior of the tube length 60 for a set amount of dwell time at a set flow rate. The magnitude of pressure, dwell time, and flow rate will vary, depending upon the wall thickness and other physical characteristics of the material used. For the polyurethane tube of the dimensions described, a pressure of 100 PSI at a flow rate of 0.4 l/min for a dwell time of 45 seconds can be used.

The introduction of pressurized air into tube length 60 causes the tube region located within the cavity 64 to expand or billow outward, forming the structure 56. The cavity 64 limits the extent to which the structure 56 expands. The structure 56, upon expansion in the cavity 64, will desirably conform to the geometry of the cavity 64. During the pressurization phase, the flow of pressurized air can be used to help cool the tube length 60.

After the pressurization phase, the tube length 60 is removed from the mold. The source of pressurized air is detached. Excess material on both sides of the formed structure region is discarded. Preferably, at least one inch of tube material is left on each side of the formed structure region to aid handling and identification during further processing.

B. Assembly of the Tool

1. Assembling the Outer Catheter Body

In a representative embodiment, the outer catheter body 16 comprises an extruded tube, made from 99% TEXIN® 5270 Material and 1% Titanium Dioxide. The TEXIN® material can be purchased in pellet form from Bayer. The outer catheter body can be extruded in a tubular shape using, e.g., a screw type (888 4:1) extrusion machine, with a GENCA™ head, with a single finger spider and a C5WB23 screen. The following table summarizes representative process settings for the extrusion.

| Extrusion Element | Nominal Setting |
|---|---|
| Die | 0.203" |
| Mandrel | 0.150" |
| Zone 1 Set/Actual | 300 degrees F |
| Zone 2 Set/Actual | 340 degrees F |
| Zone 3 Set/Actual | 400 degrees F |
| Clamp Set/Actual | 24.6 degrees F |
| Adaptor Set/Actual | 400 degrees F |
| Die 1 Set/Actual | 400 degrees F |
| Die 2 Set/Actual | 400 degrees F |
| Extruder | 400 RPM |
| Motor | In. 2300 Auto/Dis. 2929 |
| Mandrel Air | 5.2 PSI |
| Entry Hole Diameter-Distribution | 300-½" |
| Water Flow/Temperature | 20 ccm |
| Air Wipe | 20 PSI |
| Speed | 39 FPM |
| Min Dryer Time/Temperature | Overnight/160 degrees F |

The extrusion is initially cut to lengths of 16" for assembly.

Each tubing length comprising an outer catheter body 16 preferably undergoes annealing, e.g., by oven curing at 60 to 70 degrees C. for 2 to 6 hours. Annealing reduces the incidence of shrinkage of the outer catheter body 16 during sterilization and/or storage prior to use.

The proximal end of the structure 56 is heat bonded to the distal end of the outer catheter body 16 in the presence of an overlying ring of silicone tubing 68 (see FIG. 5), which compresses the outer catheter body 16 and the proximal end of the structure 56 together during the heat bonding process. In one representative assembly technique, a support mandrel (e.g., having an outside diameter of 0.075") is inserted within the outer catheter body 16, and the proximal end of the structure 56 is slid over the distal end of the outer catheter body 16. A length of the silicone tubing 68 (having, e.g., an initial inside diameter of 0.104") is subsequently slid over the proximal end of the structure 56 and the catheter body 16. Heat from the heat box is applied to the silicone tubing, and the structure and outer catheter body 16 fuse together. The silicone tubing is then discarded.

For the materials and dimensions described, representative settings for the heat box are a temperature of 545 degrees F., an air flow of 40 SCFH, and an air pressure of 20 to 30 PSI. At this setting, the silicone tubing 68 and junction of the structure 56 and the outer catheter body 16 are exposed to heat for 60 seconds, and are rotated 180 degrees after the first 30 seconds. The resulting heat bond is allowed to cool.

The outer catheter body 16 can then be cut to a desired final length, e.g., which in a representative embodiment is 350 mm measured from the center of the structure 56. In the illustrated embodiment (see FIG. 4), heat shrink tubing 70, which bears appropriate identification information for the tool 48, is bonded about the outer catheter body 16, about 0.5" from the proximal end of the outer catheter body 16.

A suitable UW adhesive (e.g., Dymax 204 CTH, available commercially from Dymax Corp) is applied to the proximal end of the outer catheter body 16, and the outer catheter body 16 is inserted into the handle 14. The adhesive joint is cured under UV light for an appropriate time period, e.g., 15 seconds. This secures the outer catheter body 16 and attached structure 56 to the handle 14.

2. Assembling The Inner Catheter Body

In a representative embodiment, the inner catheter body 18 comprises an extruded tube, made from 25% TEXIN® 5286 Material and 75% TEXIN® 5270 Material. The TEXIN® materials can be purchased in pellet form from Bayer.

The inner catheter body 18 can be extruded in a tubular shape using, e.g., a screw type (888 4:1) extrusion machine, with a GENCA™ head, with a 80–100–200 screen. The following table summarizes representative process settings for the extrusion.

| Extrusion Element | Nominal Setting |
|---|---|
| Die | 0.195" |
| Mandrel | 0.135" |
| Zone 1 Set/Actual | 360 degrees F |
| Zone 2 Set/Actual | 380 degrees F |
| Zone 3 Set/Actual | 490 degrees F |
| Clamp Set/Actual | 400 degrees F |
| Adaptor Set/Actual | 400 degrees F |
| Die 1 Set/Actual | 400 degrees F |
| Die 2 Set/Actual | 400 degrees F |
| Extruder | 30.7 RPM |
| Motor | In. 3300 Auto/Dis. 1772 |
| Mandrel Air | 1 PSI |
| Entry Hole Diameter - Distribution | 300-1" |
| Water Flow/Temperature | 20 ccm |
| Air Wipe | 20 PSI |
| Speed | 87 FPM |
| Min Dryer Time/Temperature | Overnight/160 degrees F |

The extrusion is initially cut to lengths of 16" for assembly. Like the outer catheter body 16, the inner catheter body 18 is preferably subject to heat annealing.

US 6,607,544 B1

11

After annealing, the flared region 52 is formed using a 0.099" stylet heated by a heat gun. One possible setting of the heat gun is 200 degrees C. After cooling, UV adhesive is applied to secure the flared region 52 to the second luer fitting 34, which, at this stage of assembly, is not yet connected to the handle 14. The adhesive is cured under UV light for an appropriate time period.

In the illustrated embodiment (see FIG. 5), fluoroscopic marker bands 72 are secured on the inner catheter body 18. The marker bands 72 facilitate fluoroscopic visualization of the proximal and distal ends of the structure 56 on the distal end of the tool 48. In the illustrated embodiment, the marker bands 72 are made from platinum/iridium material (commercially available from Johnson Matthey).

In a representative embodiment, the marker bands 72 are located on the inner catheter body 18 about 1 mm beyond the distal end of the outer catheter body 16 and also distally about 10.6 mm from the center of the structure 56. Prior to attaching the marker bands 72, the inner catheter body 18 (stiffened by an appropriate interior support mandrel) is inserted into the outer catheter body 16, so that the desired relative positions of the marker bands 72 can be determined using a reference tool, such as a ruler. The inner catheter body 18 is then removed from outer catheter body 16, and the marker bands 72 are affixed at the indicated positions. The distal tip of inner catheter body 18 can be cut at a 45 degree angle to facilitate slipping the marker bands 72 about the body 18. The marker bands 72 are secured to the inner catheter body 18 using, e.g., a suitable adhesive primer (e.g., Loctite 7701 Primer, which is commercially available from Loctite), followed by use of a suitable adhesive (e.g. Cyanoacrylate 4061, which is commercially available from Loctite). After the adhesive cures, the inner catheter body 18 is inserted into the outer catheter body 16 and the second luer fitting 34 is secured to the handle 14 using an UV adhesive (e.g., 204-CTH Adhesive, commercially available from Dymax). The adhesive is cured by exposure to UV light for an appropriate time period. This secures the inner catheter body 18 to the handle 14.

The distal end of the inner catheter body 18 can now be secured to the distal end of the structure 56. During this operation, the dimension of the opening 30 of the inner catheter body 18 is also reduced, to block passage of the stylet 38, as previously described.

A first support mandrel (e.g., having an outer diameter of 0.041") is placed within the inner catheter body 18. A temporary ring of silicone tubing (e.g., having an inner diameter of 0.132") is slid over the junction of the distal end of the structure 56 and the distal end of the inner catheter body 18. Using a heat box, heat is applied to the silicone tubing, which causes the distal end of the stricture 56 to shrink slightly about the inner catheter body 18. This allows a smaller diameter silicone tubing to be used to form the final bond, as will be described later. Using the materials described, the heat box is set at a temperature of 525 degrees F., an air flow of 30 SCFH, and an air pressure of 20 to 30 psi. Exposure to heat desirably occurs for 16 seconds, with the assembly rotated 180 degrees after the first eight seconds.

The first support mandrel is then removed, and a reduced diameter stylet (e.g., having an outside diameter of 0.008") is inserted into the inner catheter body 18. A smaller diameter silicone tubing 74 (made, e.g., from silicone tubing having a initial inner diameter of 0.078") (see FIG. 5) is slid over the junction for final bonding of the structure 56 to the inner catheter body 18. Heat from the above-described heat box is then applied for 30 seconds to each side of the

12

assembly. The structure-tubing interface is allowed to cool. The distal end of the structure 56 is trimmed, e.g., to a 3 mm length.

As a result of these processing steps, the inside diameter of the opening 30 is desirably reduced to a diameter that approximates the outside diameter of the reduced diameter stylet (e.g., 0.008"). This diameter is significantly smaller than the outside diameter of the stylet 38, which in the representative embodiment is 0.038". The reduced diameter of the opening 30 blocks passage of the stylet 38. Still, the reduced diameter of the opening 30 allows flushing liquid to be discharged.

The stylet 38 can now be inserted into the inner catheter body 18, with the distal end flush against the distal bond. The proximal end of the stylet 38 is secured by UV-cured adhesive (e.g., 198-M Adhesive, commercially available from Dymax) to the screw cap 50. The cap 50 can now be screwed onto the second luer fitting 34 of the handle 14.

A cut length of tubing made of Pebax™ material (e.g., 0.160 inch interior diameter) is flared at each end, using, e.g., a heat gun with a flare nozzle. This forms the insertion sleeve 54. The insertion sleeve 54 is slid over the structure 56 and onto the outer catheter body 16.

This completes the assembly of the tool 48. The tool 48 can then be packaged for sterilization in a suitable kit. If desired, the stylet 38 can be packaged next to the tool 48 to facilitate ETO sterilization, and be inserted into the inner catheter body 18 in the manner described at the time of use.

### III. Use of the Tool

#### A. Deployment in a Vertebral Body

The structure 56 is well suited for insertion into bone in accordance with the teachings of U.S. Pat. Nos. 4,969,888 and 5,108,404, which are incorporated herein by reference.

For example, as FIG. 9 shows, access can be accomplished, for example, by drilling an access portal 76 through a side of the vertebral body 26. This is called a lateral approach. Alternatively, the access portal can pass through either pedicle 42, which is called a transpedicular approach. A hand held tool can be used to facilitate formation of the access portal 76, such as disclosed in copending U.S. patent application, Ser. No. 09/421,635, filed Oct. 19, 1999, and entitled "Hand Held Instruments that Access Interior Body Regions." Another hand held tool that can be used to form the access portal 76 and gain access is disclosed in copending U.S. Pat. application Ser. No. 09/014,229 filed Jan. 27, 1998 and entitled "A Slip-Fit Handle for Hand-Held Instruments that Access Interior Body Regions."

A guide sheath or cannula 78 is placed into communication with the access portal 76, which can comprise a component part of the hand held tool just described. The catheter tube assembly 10 is advanced through the cannula 78 to deploy the structure 56 into contact with cancellous bone 32. Access in this fashion can be accomplished using a closed, minimally invasive procedure or with an open procedure.

The structure 56 is passed into the bone in a normally collapsed and not inflated condition. The presence of the stylet 38 in the inner catheter body 18 serves to keep the structure 56 in the desired distally straightened condition during its passage through the cannula 78. The insertion sleeve 54 is desirably advanced over the structure 56 prior to insertion into the cannula 78, to protect and compress the structure 56. Once deployed in cancellous bone 32, the stylet 38 can be withdrawn.

As FIG. 9 shows, expansion of the structure 56 (indicated by arrows in FIG. 9) compresses cancellous bone 32 in the vertebral body 26. The compression forms an interior cavity 80 in the cancellous bone 32.

US 6,607,544 B1

13

As FIG. 10 shows, subsequent collapse and removal of the structure 56 leaves the cavity 80 in a condition to receive a filling material 88, e.g., bone cement, allograft tissue, autograft tissue, hydroxyapatite, or synthetic bone substitute. The material 88 provides improved interior structural support for cortical bone 32.

The compaction of cancellous bone 32, as shown in FIG. 9, can also exert an interior force upon the surrounding cortical bone 28. The interior force can elevate or push broken and compressed bone back to or near its original prefracture, or other desired, condition. In the case of a vertebral body 26, deterioration of cancellous bone 32 can cause the top and bottom plates (designated TP and BP in FIG. 2), as well as the side walls (designated AW and PW in FIG. 2), to compress, crack, or move closer together, reducing the normal physiological distance between some or all of the plates. In this circumstance, the interior force exerted by the structure 56 as it compacts cancellous bone 32 moves some or all of the plates and/or walls farther apart, to thereby restore some or all of the spacing between them, which is at or close to the normal physiological distance.

There are times when a lesser amount of cancellous bone compaction is indicated. For example, where the bone disease being treated is localized, such as in avascular necrosis, or where local loss of blood supply is killing bone in a limited area, an expandable structure 56 can compact a smaller volume of total bone. This is because the diseased area requiring treatment is smaller.

Another exception lies in the use of an expandable structure 56 to improve insertion of solid materials in defined shapes, like hydroxyapatite and components in total joint replacement. In these cases, the structure shape and size is defined by the shape and size of the material being inserted.

Yet another exception lies in the use of expandable structures in bones to create cavities to aid in the delivery of therapeutic substances, as disclosed in copending U.S. patent application Ser. No. 08/485,394, previously mentioned. In this case, the cancellous bone may or may not be diseased or adversely affected. Healthy cancellous bone can be sacrificed by significant compaction to improve the delivery of a drug or growth factor which has an important therapeutic purpose. In this application, the size of the expandable structure 56 is chosen by the desired amount of therapeutic substance sought to be delivered.

It should be understood that the filling material 88 itself could be used to expand the structure 56 within the vertebral body 26, thereby causing compaction of the cancellous bone 32 and/or movement of the cortical bone 28 as previously described. If desired, the filling material 88 within the structure 56 could be allowed to harden, and the structure 56 and hardened filling material 88 could remain within the vertebral body 26. This would significantly reduce the possibility of non-hardened filling material 88 leaking outside of the vertebral body 26. Alternatively, the pressurized fluid could be withdrawn from the structure 56 after formation of some or all of the cavity 80, and filler material 88 could be injected into the structure to fill the cavity 80 and/or complete expansion of the structure 56. As another alternative, filler material 88 could be used to expand the structure 56, and the structure 56 could subsequently be removed from the vertebral body 26 before the filling material 88 within the vertebral body 26 sets to a hardened condition.

B. Expansion Characteristics of the Structure

In the illustrated embodiment, the structure 56 is created by extruding or molding a tube 60 of a selected polyurethane

14

material. The tube 60 is heated, stretched, and subjected to internal pressure. After stretching and pressure forming, the tube 60 has a normal wall thickness (T5) and a normal outside diameter (D5) (as shown in FIG. 11).

The segmented shaped regions 82 and 84 of the structure 56 are created by exposing the tube 86 to heat and positive interior pressure inside the cavity 64. Once formed, the structure 56 possesses, in an open air environment, a normal expanded shape, having diameter D7 (shown in phantom lines in FIG. 11). The normal shape and diameter D7 for the regions 82 and 84 generally correspond with the shape and dimension of the cavity spaces 92 and 94, respectively. When an interior vacuum is drawn, removing air from the structure 56, the structure 56 desirably assumes a substantially collapsed, and not inflated geometry, shown in phantom lines D6 in FIG. 11.

The regions 82 and 84 are separated by a tubular waist 86, which segments the structure 56 into two expandable regions 82 and 84. When substantially collapsed under vacuum or not inflated, the structure 56 desirably exhibits a low profile, ideal for insertion into the cannula and targeted cancellous bone region.

The introduction of fluid volume back into the structure 56 will cause each region 82 and 84 to return from the collapsed diameter D6 back to the normal, enlarged, but not distended geometry, having the shape and diameter shown in phantom lines D7 in FIG. 11.

In the illustrated embodiment, the first and second shaped regions 82 and 84 have generally the same radius of expansion and thus the same non-distended shape and diameter D7. Alternatively, each region 82 and 84 can have a different radius of expansion, and thus a different non-distended shape and diameter.

Moreover, the regions 82 and 84 can be shaped by heat and interior pressure within different cavities to assume different geometries, e.g., cylindrical or elliptical geometry, or a non-spherical, non-cylindrical, or non-elliptical geometry, with either uniform or complex curvature, and in either symmetric or asymmetric forms. Of course, more than two segmented regions 82 and 84 can be formed.

Each shaped region 82 and 84 possesses a wall thickness (designed T7 in FIG. 11) when in the normally enlarged but not distended geometry D7. Due to expansion of the wall during structure formation, the wall thickness is typically not uniform along the longitudinal axis of the structure 56, i.e., T7 is typically less than the normal wall thicknesses T5 and/or T9 of the tube 60. The wall thickness T7 for the regions 82 and 84 can be the same or different.

When in the enlarged, but not distended geometry, the waist region 86 has an outside diameter (designated D9 in FIG. 11), which is desirably equal to or greater than the diameter D5 of the tube 60. The size of the channel 96 in the fixture 90 desirably determines the magnitude of the diameter D9. Due to expansion of the material during structure formation, the waist region 86 has a wall thickness (designated T9 in FIG. 11) which is less than or equal to the wall thickness T5 of the tube 60. Desirably, the wall thickness T9 of the waist region 86 is greater than the wall thickness T7 of either fully shaped region 82 or 84.

The formed complex structure 56 thus desirably possesses regions of non-uniform minimum wall thickness along its longitudinal length; that is, $T5 \geqq T9 > T7$. The formed complex structure 56 also provides multiple expandable regions 82 and 84 of the same or different enlarged outside diameters (D7), segmented by a waist region 86.

By injecting additional fluid into the expandable structure 56, the shaped regions 82 and 84 of the structure 56 will

US 6,607,544 B1

15

desirably continue to enlarge beyond diameter D7 to a distended shape and geometry, designated D8 in FIG. 11. Typically, the wall thickness T7 further decreases and approaches T8. As the regions 82 and 84 expand, the waist region 86 will likewise expand towards diameter D10, as FIG. 11 shows. However, because the wall thickness T9 of the waist region 86 is typically greater than the wall thickness T7 of the regions 82 and 84, the waist region 86 will typically expand more slowly than the regions 82 and 84, thereby expanding the structure 56 in a more cylindrical manner, providing more uniform, elongated surface contact with cancellous bone than would a spherical expanded structure 56 of similar volume.

Enlargement of the structure 56 beyond diameter D7 desirably stretches the material in the regions 82, 84, and 86 beyond their pre-formed geometries. Desirably, these regions 82 and 84 will essentially maintain the preformed shape dictated by the cavities 92 and 94. Continued volume flow of pressurized fluid into the structure 56 continues to increase the interior volume of the structure 56 (see FIG. 12). As their volume increase, the shaped regions 82 and 84 of the structure 56 continue to enlarge beyond the normal diameter D7 toward a distended shape and geometry D8.

Of course, it should be understood that the waist region 86 could be formed of a material having different expansion characteristics than the material of the shaped regions 82 and 84, wherein a more expansion-resistant material could constrain the expansion of the waist region in a manner similar to the thickness differentials described above.

The degree of stretching and increases in volume can be tailored to achieve a desired, fully distended diameter D8. The final, fully distended diameter D8 can be selected by the treating physician, using real-time monitoring techniques, such as fluoroscopy or real-time MRI, to match the dimensions of the targeted cancellous bone region. The controlled stretching of the segmented regions 82 and 84 desirably provides compression of cancellous bone with a maximum diameter that is less than a single non-segmented region (i.e., one without the waist region 86). Stated another way, segmented regions 82 and 84, when expanded to a given inflation volume, desirably have an outer diameter less than a sphere expanded to an equal inflation volume.

While expanding in the region between D7 and D8, the structure 56, when inside bone, desirably assumes an increasingly larger surface and volume, thereby compacting surrounding cancellous bone. Inflation in cancellous bone may occur at the same pressures as outside bone. However, an increase in the inflation pressures inside bone may be required, due to the density of the cancellous bone and resistance of the cancellous bone to compaction.

For example, the configuration of the Pressure vs. Volume curve for a given material and structure 56 remains essentially the same as shown in FIG. 12, except that the generally horizontal portion of the curve between D7 and D8 is shifted upward on the Y-axis, as shown in phantom lines in FIG. 12. As a general statement, the threshold pressure inside bone is determined by the material property of the structure 56 and any added resistance due to the presence of cancellous bone.

The distance between D7 and D8, along the x-axis of FIG. 12, defines the degree to which the wall can elongate at a substantially constant pressure condition and with increasing material stress to compact cancellous bone, without failure. As volume increases at the substantially constant threshold pressure P(t), wall failure becomes more likely as the diameter of the structure enlarges significantly further beyond the distended diameter D8. There comes a point when the structure 56 can no longer increase its volume as

16

the material elasticity approaches ultimate elongation, or as material stress approaches ultimate tensile strength. When either of these ultimate values are reached, wall failure is likely. Accordingly, the distance between D7 and D8 in FIG. 12 during expansion inside bone is a simultaneous expression of the three physical and mechanical properties—expansion, shape, and toughness—as previously described.

The features of the invention are set forth in the following claims.

We claim:

1. A device for compacting cancellous bone comprising a wall made from a flexible material, the wall peripherally defining an interior space and including an expandable region preformed with a normally expanded shape outside bone, the expandable region having proximal and distal ends, the expandable region further having a first expanded section having an interior cross-sectional area adjacent the proximal end, a second expanded section having an interior cross-sectional area adjacent the distal end, and a third section having an interior cross-sectional area located between the first and second expanded sections, the interior cross-sectional area of the third section being less than the interior cross-sectional area of either the first or second expanded sections, and the first expanded section, the second expanded section, and the third expanded section further having, respectively, a first average wall thickness, a second average wall thickness, and a third average wall thickness, and the third average wall thickness being greater than either the first average wall thickness or the second average wall thickness,

the expandable region, when expanded beyond its normally expanded shape to reach a given inflation volume, presenting a maximum diameter less than a sphere expanded to an equal inflation volume.

2. A device according to claim 1

wherein the expandable region includes a further expanded shape, outside bone, having a diameter greater than the normally expanded shape.

3. A device according to claim 2

wherein the expandable region has a further expanded shape inside bone that substantially corresponds to the further expanded shape outside bone.

4. A device according to claim 1

wherein the expandable region is essentially cylindrical.

5. A device according to claim 1

wherein the expandable region expands in a non-spherical manner.

6. A device according to claim 1

wherein the expandable region expands in an essentially cylindrical manner.

7. A method for manipulating bone comprising the steps of

deploying into bone an expandable structure having a wall material peripherally defining an interior space, the structure having a proximal and a distal end, the structure further having a first expandable region located near the distal end and a second expandable region located proximally of the first expandable region, the first and second expandable regions separated by a third region of the structure, the third region having a reduced cross-sectional area as compared to the cross-sectional areas of the first and second regions, and the first expandable region, the second expandable region, and the third expandable region further having, respectively, a first average wall thickness, a second

US 6,607,544 B1

17

average wall thickness, and a third average wall thickness, and the third average wall thickness being greater than either the first average wall thickness or the second average wall thickness, and

expanding the device in bone to manipulate bone.

**8.** A method according to claim **7**

wherein the wall material of the first expandable region substantially surrounds a first maximum cross-sectional area of the interior space, the wall material of the second expandable region substantially surrounds a second maximum cross-sectional area of the interior space, and the wall material of the third region substantially surrounds a minimum cross-sectional area of the interior space, the first and second maximum cross-sectional areas each being larger than the minimum cross-sectional area.

**9.** A method according to claim **7**

wherein the wall material comprises polyurethane.

**10.** A method for compacting cancellous bone comprising the steps of

deploying into bone a device having a wall made from a flexible material, the wall peripherally defining an interior space and including an expandable region, the

18

expandable region having proximal and distal ends, the expandable region further having a first expanded section adjacent the distal end, a second expanded section located proximally of the first expanded section, and a third section located between the first and second expanded sections, wherein the average outer diameter of the third section is less than the average outer diameter of either of the first or second expanded sections, and the first expandable region, the second expandable region, and the third expandable region further having, respectively, a first average wall thickness, a second average wall thickness, and a third average wall thickness, and the third average wall thickness being greater than either the first average wall thickness or the second average wall thickness, and expanding the device inside bone to compact cancellous bone.

**11.** A method according to claim **10**

wherein the expandable region expands in response to introduction of a flowable material into the interior space.

\*  \*  \*  \*  \*

US006623505B2

(12) **United States Patent**　(10) Patent No.: **US 6,623,505 B2**
Scribner et al.　(45) Date of Patent: *Sep. 23, 2003

(54) **EXPANDABLE STRUCTURES FOR DEPLOYMENT IN INTERIOR BODY REGIONS**

(75) Inventors: **Robert M. Scribner**, Los Altos, CA (US); **Michael L. Reo**, Redwood City, CA (US)

(73) Assignee: **Kyphon Inc.**, Sunnyvale, CA (US)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/918,942

(22) Filed: **Jul. 31, 2001**

(65) **Prior Publication Data**

US 2002/0013600 A1 Jan. 31, 2002

**Related U.S. Application Data**

(62) Division of application No. 09/404,662, filed on Sep. 23, 1999, now Pat. No. 6,280,456, which is a division of application No. 08/911,827, filed on Aug. 15, 1997, now Pat. No. 5,972,015.

(51) Int. Cl.$^7$ ............................................ A61M 29/00
(52) U.S. Cl. ................................................ 606/192
(58) Field of Search ................................. 606/192, 193, 606/195, 60, 94, 190, 200; 604/20, 96.01–101.05

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,090,957 A | 2/1992 | Moutafis et al. |
| 5,108,404 A | 4/1992 | Scholten et al. |
| 5,116,305 A | 5/1992 | Milder et al. |
| 5,176,692 A | 1/1993 | Wilk et al. |
| 5,263,931 A | 11/1993 | Miller |
| 5,275,622 A | 1/1994 | Lazarus et al. |
| 5,331,975 A | 7/1994 | Bonnuti |
| 5,749,888 A | 5/1998 | Yock |
| 5,766,151 A | 6/1998 | Valley et al. |
| 5,769,816 A | * 6/1998 | Barbut et al. ............... 606/200 |
| 5,788,703 A | 8/1998 | Mittelmeier et al. |
| 5,827,289 A | 10/1998 | Reiley et al. |
| 5,928,260 A | * 7/1999 | Chin et al. ................... 606/200 |
| 6,132,824 A | 10/2000 | Hamlin |

FOREIGN PATENT DOCUMENTS

| WO | WO 94/020166 | 9/1994 |
|---|---|---|
| WO | WO 94/021320 | 9/1994 |

* cited by examiner

*Primary Examiner*—Kevin T. Truong
(74) *Attorney, Agent, or Firm*—Ryan Kromholz & Manion, S.C.

(57)　　　　**ABSTRACT**

Devices intended for deployment into interior body regions employ a catheter tube, which carries an expandable structure. The catheter tube extends along a first axis, while the expanded geometry of the structure is oriented about a second axis, which is not aligned with the first axis. The asymmetry between the two axes permits deployment of the expandable structure in a symmetric fashion with respect to the natural axis of a targeted interior body region, even when the targeted interior body region is either asymmetric in geometry or otherwise requires access along a path that is not aligned with the natural axis. The structure can include spaced apart end regions, which provide a non-conical diameter transition between the diameter of the catheter tube and the larger diameter of the expanded structure. The non-conical diameter transition mitigates the tradeoff, present in conventional structures, between achieving a desired maximum expanded diameter without undesired reduction in the effective length of the structure.

**12 Claims, 13 Drawing Sheets**





*Fig. 1*



*Fig. 2.*



*Fig. 3*



*Fig. 4*



*Fig. 5*



*Fig. 6*



Fig.7



Fig.8



*Fig. 9*



*Fig. 10*



*Fig. 11A*



*Fig. 11B*



*Fig. 12.*



*Fig. 13.*



_Fig. 14A_



_Fig. 14B_



Fig. 15



Fig. 16







*Fig. 21*



*Fig. 22*

*Fig. 23*



*Fig. 11*



Case 3:07-cv-04295-JL     Document 1-2     Filed 08/21/2007     Page 39 of 82



*Fig. 26*

*Fig. 27*

US 6,623,505 B2

**1**

# EXPANDABLE STRUCTURES FOR DEPLOYMENT IN INTERIOR BODY REGIONS

## RELATED APPLICATION

This application is a divisional of application Ser. No. 09/404,662 filed Sep. 23, 1999 now U.S. Pat. No. 6,280,456 which is a divisional of application Ser. No. 08/911,827 filed Aug. 15, 1997, now U.S. Pat. No. 5,972,015.

## FIELD OF THE INVENTION

The invention relates to expandable structures, which, in use, are deployed in interior body regions of humans and other animals.

## BACKGROUND OF THE INVENTION

The deployment of expandable structures into interior body regions is well known. For example, expandable structures, generically called "balloons," are deployed during angioplasty to open occluded blood vessels. As another example, U.S. Pat. Nos. 4,969,888 and 5,108,404 disclose apparatus and methods the use of expandable structures for the fixation of fractures or other osteoporotic and non-osteoporotic conditions of human and animal bones.

Many interior regions of the body, such as the vasculature and interior bone, possess complex, asymmetric geometries. Even if an interior body region is somewhat more symmetric, it may still be difficult to gain access along the natural axis of symmetry.

For example, deployment of an expandable structure in the region of branched arteries or veins can place the axis of an expandable structure off-alignment with the axis of the blood vessel which the structure is intended to occupy. As another example, insertion of an expandable structure into bone can require forming an access portal that is not aligned with the natural symmetry of the bone. In these instances, expansion of the structure is not symmetric with respect to the natural axis of the region targeted for treatment. As a result, expansion of the body is not symmetric with respect to the natural axis of the targeted region.

It can also be important to maximize the size and surface area of an expandable structure when deployed in an interior body region. Current medical balloons manufactured by molding techniques are designed to be guided into a narrow channel, such as a blood vessel or the fallopian tube, where they are then inflated. In this environment, the diameter of the balloon is critical to its success, but the length is less so. Such balloons only need to be long enough to cross the area of intended use, with few constraints past the effective portion of the inflated balloon. This allows conventional balloons to be constructed in three molded pieces, comprising a cylindrical middle section and two conical ends, bonded to a catheter shaft. As a practical matter, neither the length of the conical end, nor the length of the bond of the balloon to the catheter shaft, affect the function of conventional balloons, and these regions on conventional balloons are often 1 cm in length or more. Indeed, the larger the balloon diameter, the longer the end cone, which creates a tradeoff between maximum effective length and maximum effective diameter. This tradeoff makes optimization of conventional structures problematic in interior structures with defined lengths, such as bone.

## SUMMARY OF THE INVENTION

One aspect of the invention provides a device for deployment into bone. The device comprises an outer catheter tube

**2**

having a distal end. An inner catheter tube extends at least in part within the outer catheter tube and has a distal end region that extends at least in part beyond the distal end of the outer catheter tube. An expandable structure has a proximal end secured to the outer catheter tube and a distal end secured to the inner catheter tube. The expandable structure extends outside and beyond the outer catheter tube and at least partially encloses the inner catheter tube.

In a preferred embodiment, the expandable structure is sized and configured for passage within a cannula into bone when the expandable structure is in a collapsed condition.

In another aspect of the invention, the outer catheter tube has an axis and expansion of the expandable structure is asymmetric about the axis.

In another aspect of the invention, the expandable structure is adapted and configured to compress cancellous bone upon expansion of the expandable structure in bone.

In another aspect of the invention, the inner catheter tube is moveable in relation to the outer catheter tube.

Yet another aspect of the invention provides a system for treating bone that comprises the device and a cannula.

Features and advantages of the inventions are set forth in the following Description and Drawings, as well as in the appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a lateral view, partially broken away and in section, of a lumbar vertebra taken generally along line 1—1 in FIG. 2;

FIG. 2 is a coronal view of the lumbar vertebra, partially cut away and in section, shown in FIG. 1;

FIG. 3 is a top view of a probe including a catheter tube carrying a tubular expandable structure of conventional construction, shown in a substantially collapsed condition;

FIG. 4 is an enlarged side view of the tubular expandable structure carried by the probe shown in FIG. 3, shown in a substantially expanded condition;

FIG. 5 is a lateral view of the lumbar vertebra shown in FIGS. 1 and 2, partially cut away and in section, with the expandable structure shown in FIGS. 3 and 4 deployed by transpedicular access when in a substantially collapsed condition;

FIG. 6 is a coronal view of the transpedicular access shown in FIG. 5, partially cut away and in section;

FIG. 7 is a lateral view of the transpedicular access shown in FIG. 5, with the expandable structure shown in FIGS. 3 and 4 in a substantially expanded condition, forming a cavity that is not centered with respect to the middle region of the vertebral body;

FIG. 8 is a coronal view of the transpedicular access shown in FIG. 7, partially cut away and in section;

FIG. 9 is a coronal view of the lumbar vertebra shown in FIGS. 1 and 2, partially cut away and in section, with the expandable structure shown in FIGS. 3 and 4 deployed by postero-lateral access when in a substantially collapsed condition;

FIG. 10 is a coronal view of the postero-lateral access shown in FIG. 9, with the expandable structure shown in a substantially expanded condition, forming a cavity that is not centered with respect to the middle region of the vertebral body;

FIGS. 11A and 11B are side views of improved expandable structures, each having an axis of expansion that is offset by an acute angle and not aligned with the axis of the supporting catheter tube;

US 6,623,505 B2

| 3 | 4 |

FIG. 12 is a lateral view of the lumbar vertebra shown in FIGS. 1 and 2, partially cut away and in section, with the offset expandable structure shown in FIG. 11A deployed by transpedicular access and being in a substantially expanded condition, forming a cavity that is substantially centered with respect to the middle region of the vertebral body;

FIG. 13 is a coronal view of the lumbar vertebra shown in FIGS. 1 and 2, partially cut away and in section, with the offset expandable structure shown in FIG. 11 deployed by postero-lateral access and being in a substantially expanded condition, forming a cavity that is substantially centered with respect to the middle region of the vertebral body;

FIGS. 14A and 14B are side views of other embodiments of improved expandable structures, each having an axis of expansion that is offset by a distance from the axis of the supporting catheter tube;

FIG. 15 is a side view of a conventional expandable structure shown in FIG. 4, enlarged to show further details of its geometry when substantially expanded;

FIG. 16 is a side view of an improved expandable structure, when in a substantially expanded condition, which includes end regions having compound curvatures that reduce the end region length and thereby provide the capability of maximum bone compaction substantially along the entire length of the structure;

FIG. 17 is a side view of an improved expandable structure, when in a substantially expanded condition, which includes end regions having compound curvatures that invert the end regions about the terminal regions, where the structure is bonded to the supporting catheter tube, to provide the capability of maximum bone compaction substantially along the entire length of the structure;

FIG. 18 is a side section view of an improved expandable structure, when in a substantially expanded condition, which includes end regions that have been tucked or folded about the terminal regions, where the structure is bonded to the supporting catheter tube, to provide the capability of maximum bone compaction substantially along the entire length of the structure;

FIG. 19 is a side section view of a tubular expandable structure having a distal end bonded to an inner catheter tube and a proximal end bonded to an outer catheter tube, the inner catheter tube being slidable within the outer catheter tube;

FIG. 20 is a side section view of the tubular expandable structure shown in FIG. 19, after sliding the inner catheter tube within the outer catheter tube to invert the end regions of the structure about the distal and proximal bonds, to thereby provide the capability of maximum bone compaction substantially along the entire length of the structure;

FIG. 21 is a side section view of a tubular expandable structure having a distal end bonded to an inner catheter tube and a proximal end bonded to an outer catheter tube, the inner catheter tube and structure being made of a more compliant material than the outer catheter tube to provide proportional length and diameter expansion characteristics;

FIG. 22 is an enlarged plan view of a branched blood vasculature region, in which an occlusion exists;

FIG. 23 is a further enlarged view of the branched blood vasculature region shown in FIG. 22, in which an asymmetric expandable structure of the type shown in FIG. 11 is deployed to open the occlusion;

FIG. 24 is a plan view of a sterile kit to store a single use probe, which carries an expandable structures as previously shown;

FIG. 25 is an exploded perspective view of the sterile kit shown in FIG. 24;

FIG. 26 is a side view, with parts broken away and in section, of an expandable structure having an enclosed stiffening member, to straighten the structure during passage through a guide sheath into an interior body region; and

FIG. 27 is a side view of the expandable structure shown in FIG. 27, after deployment beyond the guide sheath and into the interior body region, in which the stiffening member includes a distal region having a preformed bend, which deflects the structure relative to the axis of the guide sheath.

The invention may be embodied in several forms without departing from its spirit or essential characteristics. The scope of the invention is defined in the appended claims, rather than in the specific description preceding them. All embodiments that fall within the meaning and range of equivalency of the claims are therefore intended to be embraced by the claims.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

The preferred embodiment first describes improved systems and methods that embody features of the invention in the context of treating bones. This is because the new systems and methods are advantageous when used for this purpose.

Another preferred embodiment describes the improved systems and methods in the context of relieving constrictions or blockages within branched blood vessels. This is because the vasculature also presents an environment well suited to receive the benefits of the invention.

The two environments are described for the purpose of illustration. However, it should be appreciated that the systems and methods as described are not limited to use in the treatment of bones or the vasculature. The systems and methods embodying the invention can be used virtually in any interior body region that presents an asymmetric geometry, or otherwise requires an access path that is not aligned with the natural axis of the region.

I. Deployment in Bones

The new systems and methods will be first described in the context of the treatment of human vertebra. Of course, other human or animal bone types, e.g., long bones, can be treated in the same or equivalent fashion.

FIG. 1 shows a lateral (side) view of a human lumbar vertebra 12. FIG. 2 shows a coronal (top) view of the vertebra. The vertebra 12 includes a vertebral body 26, which extends on the anterior (i.e., front or chest) side of the vertebra 12. The vertebral body 26 is in the shape of an oval disk. The geometry of the vertebral body 26 is generally symmetric arranged about its natural mid-anterior-posterior axis 66, natural mid-lateral axis 67, and natural mid-top-to-bottom axis 69. The axes 66, 67, and 69 intersect in the middle region or geometric center of the body 26, which is designated MR in the drawings.

As FIGS. 1 and 2 show, the vertebral body 26 includes an exterior formed from compact cortical bone 28. The cortical bone 28 encloses an interior volume 30 of reticulated cancellous, or spongy, bone 32 (also called medullary bone or trabecular bone).

The spinal canal 36 (see FIG. 2), is located on the posterior (i.e., back) side of each vertebra 12. The spinal cord (not shown) passes through the spinal canal 36. The vertebral arch 40 surrounds the spinal canal 36. Left and right pedicles 42 of the vertebral arch 40 adjoin the vertebral

US 6,623,505 B2

5

body 26. The spinous process 44 extends from the posterior of the vertebral arch 40, as do the left and right transverse processes 46.

U.S. Pat. Nos. 4,969,888 and 5,108,404 disclose apparatus and methods for the fixation of fractures or other conditions of human and other animal bone systems, both osteoporotic and non-osteoporotic. The apparatus and methods employ an expandable structure to compress cancellous bone and provide an interior cavity. The cavity receives a filling material, e.g., bone cement, which hardens and provides renewed interior structural support for cortical bone. The compaction of cancellous bone also exerts interior force upon cortical bone, making it possible to elevate or push broken and compressed bone back to or near its original prefracture, or other desired, condition.

FIG. 3 shows a tool 48, which includes a catheter tube 50 having a proximal and a distal end, respectively 52 and 54. The catheter tube 50 includes a handle 51 to facilitate gripping and maneuvering the tube 50. The handle 51 is preferably made of a foam material secured about the catheter tube 50.

The distal end 54 carries an expandable structure 56, which FIG. 3 shows to be of conventional construction. The structure 56 is shown in FIG. 3 in a substantially collapsed geometry. The structure 56 conventionally comprises an elongated tube, formed, for example, by standard polymer extrusion and molding processes. The tubular structure 56 is bonded at its opposite ends 58 to the catheter tube 50, using, for example, an adhesive. When substantially collapsed, the structure 56 can be inserted into an interior body region.

Tubular bodies of the type shown in FIG. 3 are made from polymer materials and are commonly deployed in veins and arteries, e.g., in angioplasty applications. FIG. 4 shows an enlarged view of the catheter tube 56 when in a substantially expanded geometry. As FIG. 4 shows, the middle region 64 of the tubular structure 56, when substantially expanded, assumes a generally cylindrical shape, which is symmetric about the main axis 60 of the catheter tube 50. Expansion stretches the polymer material of the structure 56 near its bonded ends 58 to form generally conical end portions 62.

The structure 56 can be inserted into bone in accordance with the teachings of the above described U.S. Pat. Nos. 4,969,888 and 5,108,404. For a vertebral body 26, access into the interior volume 30 can be accomplished, for example, by drilling an access portal 43 through either a pedicle 42. This is called a transpedicular approach, which FIG. 5 shows in lateral view and FIG. 6 shows in coronal view. As FIG. 5 shows, the access portal 43 for a transpedicular approach enters at the top of the vertebral body 26, where the pedicle 42 is relatively thin, and extends at an angle downward toward the bottom of the vertebral body 26 to enter the interior volume 30. As FIGS. 5 and 6 show, in a typical transpedicular approach, the access portal 43 aligns the catheter tube axis 60 obliquely with respect to all natural axes 66, 67, or 69 of the vertebral body 26.

As the conventional structure 56 expands within the interior volume 30 (as FIGS. 7 and 8 show, respectively, in lateral and coronal views for the transpedicular approach), the structure 56 symmetrically expands about the catheter tube axis 60, compressing cancellous bone 32 to form a cavity 68. However, since the catheter tube axis 60 is oriented obliquely relative to all natural axes 66, 67, or 69, the formed cavity is not centered with respect to the middle region MR. Instead, the cavity 68 is offset on one lateral side of the middle region MR (as FIG. 8 shows) and also extends from top to bottom at oblique angle through the middle region MR (as FIG. 7 shows).

6

Due to these asymmetries, the cavity 68 will not provide optimal support for the middle region MR when filled with bone cement. Since the bone cement volume is not centered about the middle region MR, the capability of the vertebral body 26 to withstand loads is diminished. The asymmetric compaction of cancellous bone 32 in the interior volume 30 may also exert unequal or nonuniform interior forces upon cortical bone 32, making it difficult to elevate or push broken and compressed bone.

As FIG. 9 shows, access to the interior volume 30 of the vertebral body 26 also can be achieved by drilling an access portal 45 through a side of the vertebral body 26, which is called the postero-lateral approach. The portal 45 for the postero-lateral approach enters at a posterior side of the body 26 and extends at angle forwardly toward the anterior of the body 26.

As FIG. 9 shows, the orientation of the portal 45 in a typical postero-lateral approach does not permit parallel or perpendicular alignment of the catheter tube axis 60 with either the mid-lateral axis 67 or the mid-anterior-posterior axis 66 of the vertebral body 26. As a result, symmetric expansion of the conventional structure 56 about the catheter tube axis 60 forms an off-centered cavity 68', which extends obliquely across the middle region MR of the body 26, as FIG. 10 view shows. As with the cavity 68 formed by the structure 56 using transpedicular access, the off-centered cavity 68' formed by the structure 56 using postero-lateral access also fails to provide optimal support to the middle region MR when filled with bone cement.

A. Optimal Orientation for Cancellous Bone Compaction

FIG. 11A shows an improved bone treating tool 14, which includes a catheter tube 16 carrying at its distal end 18 an expandable structure 20. The catheter tube 16 can, at its proximal end, be configured like the tube 50 shown in FIG. 3, with a handle 51 made of, e.g., a foam material.

FIG. 11A shows the structure 20 in a substantially expanded condition, in which the structure comprises a cylinder 21 with generally conical portions 34, each having a top 25 and a base 27. The tops 25 of conical portions 34 are secured about the catheter tube 16 and, in this respect, are generally aligned with the catheter tube axis 24. However, unlike the expandable structure 56 shown in FIG. 4, the main axis 22 of the cylinder 21 and the axis 24 of the catheter tube 16 are not aligned. Instead, the cylinder axis 22 is offset at an angle A from the catheter tube axis 24. As a result, the structure 20, when substantially expanded (as FIG. 11A shows), is not symmetric with respect to the catheter tube axis 24.

In FIG. 11A, the bases 27 of the conical portions 34 extend generally perpendicularly to the cylinder axis 22. In this orientation, the tops 25 and the bases 27 are not parallel to each other. Other orientations are possible. For example, in FIG. 11B, the bases 27 of the conical portions 34 extend generally perpendicularly to the catheter tube axis 24. In this orientation, the tops 25 and the bases 27 are generally parallel to each other.

FIG. 12 shows in lateral view, the offset structure 20 shown in FIG. 11A deployed by a transpedicular approach in the interior volume 30 of a vertebral body 26. As before shown in FIGS. 7 and 8, the transpedicular approach in FIG. 12 does not align the catheter tube axis 24 with any of the natural axes 66, 67, and 69 of the body 26. However, as FIG. 12 shows, the expansion of the offset cylinder 21 of the structure 20 about its axis 22 is not symmetric with respect to the catheter tube axis 24. Instead, expansion of the offset structure 20 is generally aligned with the natural axes 66 and

7

69 of the vertebral body 26. As FIG. 12 shows, a single offset structure 20 introduced by transpedicular access, forms a cavity 38 that, while still laterally offset to one side of the middle region MR (as shown in FIG. 8), is nevertheless symmetric in a top-to-bottom respect with the middle region MR. A matching, adjacent cavity can be formed by transpedicular deployment of a second offset structure 20 on the opposite lateral side of the vertebral body 26. The composite cavity, formed by the two offset bodies 20, introduced simultaneously or in succession by dual transpedicular access, is substantially centered in all respects about the middle region MR.

FIG. 13 shows the offset expandable structure 20 deployed by a postero-lateral approach in the interior volume 30 of a vertebral body 26. As before shown in FIG. 9, the postero-lateral approach in FIG. 13 does not align the catheter tube axis 24 with the natural axes 66 and 67 of the body 26. The expansion of the offset structure 20, which is asymmetric about the catheter tube axis 24, is nevertheless generally symmetric with respect to all natural axes 66, 67, and 69 of the vertebral body 26. A single offset structure 20, deployed by postero-lateral access, forms a cavity 38', which is substantially centered about the middle region MR.

A cavity centered with respect to the middle region MR provides support uniformly across the middle region MR when filled with bone cement. The capability of the vertebral body 26 to withstand loads is thereby enhanced. The symmetric compaction of cancellous bone 32 in the interior volume 30 that a centered cavity provides also exerts more equal and uniform interior forces upon cortical bone 32, to elevate or push broken and compressed bone.

FIGS. 14A and 14B show an expandable structure 200 having an offset, asymmetric geometry different than the geometry of the offset expandable structure 20 shown in FIGS. 11A and 11B. In FIGS. 11A and 11B, the offset angle A between the cylinder axis 22 and the catheter tube axis 24 is an acute angle. As a result, the axis 22 of the structure 20 is offset in a nonparallel dimension or plane relative to the catheter tube axis 24. In FIGS. 14A and 14B, the offset angle A between the cylinder axis 220 and the catheter tube axis 240 is zero, as the axis 220 of the cylinder 210 is offset at a distance from and in a generally parallel dimension or plane relative to the catheter tube axis 240. The catheter tube 160 can, at its proximal end, be configured like the tube 50 shown in FIG. 3, with a handle 51 made of, e.g., a foam material.

As in FIGS. 11A and 11B, the tops 250 of conical portions 340 are secured about the catheter tube 160 and, in this respect, are generally aligned with the catheter tube axis 240. In FIGS. 14A and 14B, the orientation of the bases 270 of the conical portions 340 differ. In FIG. 14A, the bases 270 of the conical portions 340 extend generally perpendicularly to the catheter tube axis 240, and are therefore generally parallel to the tops 250 (comparable to the orientation shown in FIG. 11B). In FIG. 14B, the bases 270 of the conical portions 340 extend at an angle B to the catheter tube axis 240. In this orientation, the tops 250 and the bases 270 are not parallel to each other.

FIGS. 11A and 11B and 14A and 14B show that it is possible, by adjustment of the offset angle A, as well as adjustment of the orientation of the conical end bases, to achieve virtually any desired offset geometry, and thereby tailor the orientation of the expandable structure to the particular geometry of the point of use.

B. Maximizing Cancellous Bone Compaction

Referring back to FIG. 4, when the conventional tubular structure 56 shown in FIG. 4 is substantially expanded,

8

material of the structure is stretched into conical sections 62 near the ends 58, which are bonded to the catheter tube 50. FIG. 15 shows the geometry of expanded tubular structure 56 in greater detail. The conical portions 62 extend at a cone angle $\alpha$ from the bonded ends 58. The expanded structure 56 therefore presents the generally cylindrical middle region 64, where the maximum diameter of the structure 56 ($BODY_{DIA}$) exists, and the conical portions 62, which comprise regions of diameter that decreases with distance from the middle region 64 until reaching the diameter of the catheter tube ($TUBE_{DIA}$).

Due to the geometry shown in FIG. 15, maximum cancellous bone compaction does not occur along the entire length (L2) of the conventional structure 56, as measured between the bonded ends 58. Instead, maximum cancellous bone compaction occurs only along the effective length (L1) of the cylindrical middle region 64 of the structure 56, where the structure 56 presents its maximum diameter $BODY_{DIA}$. Cancellous bone compaction diminishes along the length of the conical portions 62, where the structure's diameter progressively diminishes. At the bonded ends 58, and portions of the catheter tube 50 extending beyond the bonded ends 58, no bone compaction occurs. The catheter tube 50 can, at its proximal end, be configured like the tube 50 shown in FIG. 3, with a handle 51 made of, e.g., a foam material.

The lengths (Lc) of the conical regions 62 and bonded ends 58 relative to the entire length of the structure 56 (L2) are important indications of the overall effectiveness of the structure 56 for compacting cancellous bone. The effective bone compaction length (L1) of any expandable structure having conical end regions, such as structure 56 shown in FIG. 15, can be expressed as follows:

$$L1 = L2 - 2(Lc)$$

where the length of a given conical region (Lc) can be expressed as follows:

$$Lc = \frac{h}{\tan\frac{\alpha}{2}}$$

where:

$$h = \frac{BODY_{DIA} - TUBE_{DIA}}{2}$$

where (see FIG. 15):

$BODY_{DIA}$ is the maximum diameter of the middle region 64, when substantially expanded,

$TUBE_{DIA}$ is the diameter of the catheter tube 50, and

$\alpha$ is the angle of the conical portion.

As the foregoing expressions demonstrate, for a given conical angle $\alpha$, the length Lc of the conical portions 62 will increase with increasing maximum diameter $BODY_{DIA}$ of the middle region 64. Thus, as $BODY_{DIA}$ is increased, to maximize the diameter of the formed cavity, the lengths Lc of the conical portions 62 also increase, thereby reducing the effective length L1 of maximum cancellous bone compaction.

The bone compaction effectiveness of an expandable structure of a given maximum diameter increases as L1 and L2 become more equal. The geometry of a conventional tubular structure 56 shown in FIG. 15 poses a tradeoff between maximum compaction diameter and effective com-

9

10

paction length. This inherent tradeoff makes optimization of the structure 56 for bone compaction application difficult.

FIG. 16 shows an improved structure 70 having a geometry, when substantially expanded, which mitigates the tradeoff between maximum compaction diameter and effective compaction length. The structure 70 includes a middle region 72, where $BODY_{DIA}$ occurs. The structure 70 also includes end regions 74, which extend from the middle region 72 to the regions 76, where the material of the structure is bonded to the catheter tube 78, at $TUBE_{DIA}$. The catheter tube 78 can, at its proximal end, be configured like the tube 50 shown in FIG. 3, with a handle 51 made of, e.g., a foam material.

In the embodiment shown in FIG. 16, the end regions 74 are molded or stressed to provide a non-conical diameter transformation between $BODY_{DIA}$ and $TUBE_{DIA}$. The diameter changes over two predefined radial sections $r_1$ and $r_2$, forming a compound curve in the end regions 74, instead of a cone. The non-conical diameter transformation of radial sections $r_1$ $_{and}$ $_{r2}$ between $BODY_{DIA}$ and $TUBE_{DIA}$ reduces the differential between the effective bone compaction length L1 of the structure 70 and the overall length L2 of the structure 70, measured between the bond regions 76.

FIG. 17 shows another improved expandable structure 80 having a geometry mitigating the tradeoff between maximum compaction diameter and effective compaction length. Like the structure 70 shown in FIG. 16, the structure 80 in FIG. 16 includes a middle region 82 of $BODY_{DIA}$ and end regions 84 extending from the middle region to the bonded regions 86, at $TUBE_{DIA}$. As the structure 70 in FIG. 16, the end regions 84 of the structure 80 make a non-conical diameter transformation between $BODY_{DIA}$ and $TUBE_{DIA}$. In FIG. 17, the predefined radial sections $r_1$ and $r_2$ are each reduced, compared to the radial section $r_1$ and $r_2$ in FIG. 16. As a result, the end regions 84 take on an inverted profile. As a result, the entire length L2 between the bonded regions 86 becomes actually less than the effective length L1 of maximum diameter $BODY_{DIA}$. The catheter tube can, at its proximal end, be configured like the tube 50 shown in FIG. 3, with a handle 51 made of, e.g., a foam material.

The structures 70 and 80, shown in FIGS. 16 and 17, when substantially inflated, present, for a given overall length L2, regions of increasingly greater proportional length L1, where maximum cancellous bone compaction occurs.

Furthermore, as in FIG. 17, the end regions 84 are inverted about the bonded regions 86. Due to this inversion, bone compaction occurs in cancellous bone surrounding the bonded regions 86. Inversion of the end regions 84 about the bonded regions 86 therefore makes it possible to compact cancellous bone along the entire length of the expandable structure 80.

FIG. 18 shows another embodiment of an improved expandable structure 90. Like the structure 80 shown in FIG. 17, the structure 90 includes a middle region 92 and fully inverted end regions 96 overlying the bond regions 96. The structure 80 comprises, when substantially collapsed, a simple tube. At least the distal end of the tubular structure 80 is mechanically tucked or folded inward and placed into contact with the catheter tube 98. As shown in FIG. 18, both proximal and distal ends of the tubular structure are folded over and placed into contact with the catheter tube 98. The catheter tube 98 can, at its proximal end, be configured like the tube 50 shown in FIG. 3, with a handle 51 made of, e.g., a foam material.

The catheter tube 98 is dipped or sprayed beforehand with a material 102 that absorbs the selected welding energy, for example, laser energy. The folded-over ends 94 are brought into abutment against the material 102. The welding energy transmitted from an external source through the middle region 92 is absorbed by the material 102. A weld forms, joining the material 102, the folded-over ends 94, and the catheter tube 50. The weld constitutes the bond regions 96.

The inverted end regions 94 of the structure 90 achieve an abrupt termination of the structure 90 adjacent the distal end 104 of the catheter tube 98, such that the end regions 94 and the distal catheter tube end 104 are coterminous. The structure 90 possesses a region of maximum structure diameter, for maximum cancellous bone compaction, essentially along its entire length. The structure 90 presents no portion along its length where bone compaction is substantially lessened or no cancellous bone compaction occurs.

FIGS. 19 and 20 show another embodiment of an expandable structure 110. As FIG. 20 shows, the structure 110 includes a middle region 112 of maximum diameter $BODY_{DIA}$ and inverted end regions 114, which overlie the bonded regions 116.

FIG. 19 shows the structure 110 before the end regions 114 have been inverted in the manufacturing process. As FIG. 19 shows, the structure 110 comprises, when substantially collapsed, a simple tube. To facilitate formation of the inverted end regions 114 and bonded regions 116, a two-piece catheter tube is provided, comprising an outer catheter tube 118 and an inner catheter tube 120. The inner catheter tube 120 slides within the outer catheter tube 118. The catheter tube 118 can, at its proximal end, be configured like the tube 50 shown in FIG. 3, with a handle 51 made of, e.g., a foam material.

As FIG. 19 shows, during the manufacturing process, the inner catheter tube 120 is moved a first distance d1 beyond the outer catheter tube 118. In this condition, the proximal and distal ends 122 and 124 of the tubular structure 110 are bonded, without folding over or tucking in, about the inner catheter tube 118 and the outer catheter tube 120, respectively. The unfolded ends 122 and 124 of the tubular structure 110 can then be directly exposed to conventional adhesive or melt bonding processes, to form the bonded regions 116.

Once the bonded regions 116 are formed, the inner catheter tube 120 is moved (see arrow 130 in FIG. 20) to a distance d2 (shorter than d1) from the end of the outer catheter tube 118. The shortening of the inner tube 120 relative to the outer tube 120 inverts the ends 122 and 124. The inversion creates double jointed end regions 116 shown in FIG. 20, which overlie the bonded regions 116. The relative position of the outer and inner catheter tubes 118 and 120 shown in FIG. 20 is secured against further movement, e.g., by adhesive, completing the assemblage of the structure 110.

The double jointed inverted ends 114 of the structure 110 in FIG. 20, like single jointed inverted ends 94 of the structure 90 in FIG. 18, assure that no portion of the catheter tube protrudes beyond the expandable structure. Thus, there is no region along either structure 94 or 114 where cancellous bone compaction does not occur. Like the structure 90 shown in FIG. 18, the structure 110 in FIG. 20 presents a maximum diameter for maximum cancellous bone compaction essentially along its entire length.

FIG. 21 shows another embodiment of an improved expandable structure 300 well suited for deployment in an interior body region. Like the structure 110 shown in FIGS. 19 and 20, the structure 300 in FIG. 21 includes an inner catheter tube 304 secured within an outer catheter tube 302. Like the structure 110 shown in FIGS. 19 and 20, the distal end 310 of the inner catheter tube 304 in FIG. 21 extends beyond the distal end 308 of the outer catheter tube 302.

US 6,623,505 B2

11                                                          12

The outer diameter of the inner catheter tube 304 is likewise smaller than the inner diameter of the outer catheter tube 302. A flow passage 312 is defined by the space between the two catheter tubes 302 and 304.

The proximal end 314 of an expandable body 306 is bonded to the distal end 308 of the outer catheter tube 302. The distal end 316 of the expandable body 306 is bonded to the distal end 310 of the inner catheter tube 304. An inflation medium 318 is conveyed into the body 306 through the flow passage 312, causing expansion of the body 306.

In FIG. 21, the physical properties of the structure 300 at the proximal body end 314 differ from the physical properties of the structure 300 at the distal body end 316. The different physical properties are created by material selection. More particularly, materials selected for the inner catheter tube 304 and the expandable body 306 are more compliant (i.e., more elastic) than the materials selected for the outer catheter tube 302. In a preferred embodiment, materials selected for the expandable body 306 and the inner catheter tube 304 possess hardness properties of less than about 90 Shore A and ultimate elongation of greater than about 450%, e.g., more compliant polyurethanes. In a preferred embodiment, materials selected for the outer catheter tube 302 possess hardness properties of greater than about 45 Shore D and ultimate elongation of less than about 450%, e.g., less compliant polyurethanes or polyethylenes.

Due to the differential selection of materials, the lack of compliance of the outer catheter tube 302 at the proximal body end 314 is counterbalanced during expansion of the body 306 against the compliance of the inner catheter tube 304 at the distal body end 316. The different compliance characteristics causes the body 306, during expansion, to increase in length in proportion to its increase in diameter during expansion. By virtue of the more compliant body 306 and inner catheter tube 304, the structure 300 shown in FIG. 21 is elastic enough to conform to an interior body region, like inside a bone. Nevertheless, the structure 300 is constrained from overexpansion by attachment of the proximal end 314 of the body 306 to the less elastic outer catheter tube 302.

The bond between a given expandable structure and its associated catheter tube can be strengthened by using a $CO_2$ or NdYAG laser to weld the structure and tube materials together. Factors influencing joint strength include energy wave length, energy pulse width, pulse period, head voltage, spot size, rate of rotation, working distance, angle of attack, and material selection.

The catheter tube 302 can, at its proximal end, be configured like the tube 50 shown in FIG. 3, with a handle 51 made of, e.g., a foam material.

II. Deployment in the Vasculature

FIG. 22 shows a blood vasculature region 400. The region 400 includes a first blood vessel 402, which extends along a first axis 404. The region 400 also includes a second blood vessel 406, which branches from the first blood vessel 402 along a second axis 408 offset from the first axis 404.

FIG. 22 also shows the presence of an occlusion 410 adjacent the second blood vessel 406. The occlusion 410 can comprise, e.g., plaque buildup along the interior wall of the second blood vessel 406.

FIG. 23 shows the distal end of a tool 412, which has been introduced into the vascular region 400 for the purpose of opening the occlusion 410. The tool 412 comprises a catheter tube 416, which carries at its distal end an expandable structure 420 of the type shown in FIG. 11. The catheter tube 416 can, at its proximal end, be configured like the tube 50 shown in FIG. 3, with a handle 51 made of, e.g., a foam material.

The catheter tube 416 is introduced by conventional vascular introducer and, with fluoroscopic monitoring, steered to the targeted region 400 along a guidewire 430 deployed within the first and second vessels 402 and 406. The structure 420 is expanded using a sterile fluid, like saline or a radio-contrast medium. FIG. 23 shows the structure 420 in a substantially expanded condition.

Like the expandable structure 20 shown in FIG. 11, the main axis 422 of the structure 420 shown in FIG. 23 and the axis 424 of the catheter tube 416 are not aligned. Instead, the structure axis 422 is offset at a selected acute angle A from the catheter tube axis 424. Due to the offset angle A, the structure 420, when substantially expanded (as FIG. 23 shows), is not symmetric with respect to the catheter tube axis 424.

As FIG. 23 shows, the asymmetric expansion of the structure 420 allows the physician to maintain the catheter tube 416 in axial alignment with the first blood vessel 402, while maintaining the expandable structure 420 in axial alignment with the second blood vessel 406. In this orientation, expansion of the structure 420 within the second blood vessel 406 opens the occlusion 410. The asymmetry of the structure 420 relative to the catheter tube 416 thereby permits access to branched blood vessels without complex manipulation and steering.

III. Deflection of the Structure

In all of the foregoing embodiments, a length of the associated catheter tube extends within the expandable structure. In the embodiments shown in FIGS. 4, 11A/B, 14A/B, and 15 to 18, the enclosed catheter tube comprises an extension of the main catheter tube. In the embodiments shown in FIGS. 19 to 21, the enclosed catheter tube comprises a separate catheter tube carried by the main catheter tube.

Regardless of the particular construction (see FIG. 26), the enclosed length of catheter tube 600 provides an interior lumen 602 passing within the expandable structure 604. The lumen 602 accommodates the passage of a stiffening member or stylet 606 made, e.g., from stainless steel or molded plastic material.

The presence of the stylet 606 serves to keep the structure 604 in the desired distally straightened condition during passage through an associated guide sheath 608 toward the targeted body region 610, as FIG. 26 shows. Access to the target body region 610 through the guide sheath 608 can be accomplished using a closed, minimally invasive procedure or with an open procedure.

As shown in FIG. 27, the stylet 606 can have a preformed memory, to normally bend the distal region 612 of the stylet 606. The memory is overcome to straighten the stylet 606 when confined within the guide sheath 608, as FIG. 26 shows. However, as the structure 604 and stylet 606 advance free of the guide sheath 608 and pass into the targeted region 610, the preformed memory bends the distal stylet region 612. The bend of the distal stylet region 612 bends the tube 600 and thereby shifts the axis 614 of the attached expandable structure 604 relative to the axis 616 of the access path (i.e., the guide sheath 608). The prebent stylet 606, positioned within the interior of the structure 604, further aids in altering the geometry of the structure 604 in accordance with the orientation desired when the structure 604 is deployed for use in the targeted region 610.

IV. Material Selection

In any of the foregoing embodiments, the material of the expandable structure can be selected according to the therapeutic objectives surrounding its use. For example, materials including vinyl, nylon, polyethylenes, ionomer,

US 6,623,505 B2

13

14

polyurethane, and polyethylene tetraphthalate (PET) can be used. The thickness of the structure is typically in the range of 2/1000ths to 25/1000ths of an inch, or other thicknesses that can withstand pressures of up to, for example, 250–500 psi.

If desired, the material for the structure can be selected to exhibit generally elastic properties, like latex. Alternatively, the material can be selected to exhibit less elastic properties, like silicone. Using expandable bodies with generally elastic or generally semi-elastic properties, the physician monitors the expansion to assure that over-expansion and wall failure do not occur. Furthermore, expandable bodies with generally elastic or generally semi-elastic properties may require some form of external or internal restraints to assure proper deployment in bone. The use of internal or external restraints in association with expandable bodies used to treat bone is discussed in greater detail in copending U.S. patent application Ser. No. 08/485,394, filed Jun. 7, 1995, which is incorporated herein by reference.

Generally speaking, for use in treating bone, providing relatively inelastic properties for the expandable structure, while not always required, is nevertheless preferred, when maintaining a desired shape and size within the bone is important, for example, in a vertebral body, where the spinal cord is nearby. Using relatively inelastic bodies, the shape and size can be better predefined, taking into account the normal dimensions of the outside edge of the cancellous bone. Use of relatively inelastic materials also more readily permits the application of pressures equally in a defined geometry to compress cancellous bone.

When treating bone, the choice of the shape and size of a expandable structure takes into account the morphology and geometry of the site to be treated. The shape of the cancellous bone to be compressed, and the local structures that could be harmed if bone were moved inappropriately, are generally understood by medical professionals using textbooks of human skeletal anatomy along with their knowledge of the site and its disease or injury. The physician is also able to select the materials and geometry desired for the structure based upon prior analysis of the morphology of the targeted bone using, for example, plain films, spinous process percussion, or MRI or CRT scanning. The materials and geometry of the structure are selected to optimize the formation of a cavity that, when filled with bone cement, provide support across the middle region of the bone being treated.

In some instances, it is desirable, when creating a cavity, to also move or displace the cortical bone to achieve the desired therapeutic result. Such movement is not per se harmful, as that term is used in this Specification, because it is indicated to achieve the desired therapeutic result. By definition, harm results when expansion of the structure results in a worsening of the overall condition of the bone and surrounding anatomic structures, for example, by injury to surrounding tissue or causing a permanent adverse change in bone biomechanics.

As one general guideline, the selection of the geometry of the expandable structure should take into account that at least 40% of the cancellous bone volume needs to be compacted in cases where the bone disease causing fracture (or the risk of fracture) is the loss of cancellous bone mass (as in osteoporosis). The preferred range is about 30% to 90% of the cancellous bone volume. Compacting less of the cancellous bone volume can leave too much of the diseased cancellous bone at the treated site. The diseased cancellous bone remains weak and can later collapse, causing fracture, despite treatment.

Another general guideline for the selection of the geometry of the expandable structure is the amount that the

targeted fractured bone region has been displaced or depressed. The expansion of the structure within the cancellous bone region inside a bone can elevate or push the fractured cortical wall back to or near its anatomic position occupied before fracture occurred.

However, there are times when a lesser amount of cancellous bone compaction is indicated. For example, when the bone disease being treated is localized, such as in avascular necrosis, or where local loss of blood supply is killing bone in a limited area, the expandable structure can compact a smaller volume of total bone. This is because the diseased area requiring treatment is smaller.

Another exception lies in the use of an expandable structure to improve insertion of solid materials in defined shapes, like hydroxyapatite and components in total joint replacement. In these cases, the structure shape and size is defined by the shape and size of the material being inserted.

Yet another exception lays the use of expandable bodies in bones to create cavities to aid in the delivery of therapeutic substances, as disclosed in copending U.S. patent application Ser. No. 08/485,394, previously mentioned. In this case, the cancellous bone may or may not be diseased or adversely affected. Healthy cancellous bone can be sacrificed by significant compaction to improve the delivery of a drug or growth factor which has an important therapeutic purpose. In this application, the size of the expandable structure is chosen by the desired amount of therapeutic substance sought to be delivered. In this case, the bone with the drug inside is supported while the drug works, and the bone heals through exterior casting or current interior or exterior fixation devices.

The materials for the catheter tube are selected to facilitate advancement of the expandable structure into cancellous bone. The catheter tube can be constructed, for example, using standard flexible, medical grade plastic materials, like vinyl, nylon, polyethylenes, ionomer, polyurethane, and polyethylene tetraphthalate (PET). The catheter tube can also include more rigid materials to impart greater stiffness and thereby aid in its manipulation. More rigid materials that can be used for this purpose include stainless steel, nickel-titanium alloys (Nitinol™ material), and other metal alloys.

V. Single Use

Expansion of any one of the expandable structures described herein during first use in a targeted body region generates stress on the material or materials which make up the structure. The material stress created by operational loads during first use in a targeted body region can significantly alter the molded morphology of the structure, making future performance of the structure unpredictable.

For example, expansion within bone during a single use creates contact with surrounding cortical and cancellous bone. This contact can damage the structure, creating localized regions of weakness, which may escape detection. The existence of localized regions of weakness can unpredictably cause overall structural failure during a subsequent use.

In addition, exposure to blood and tissue during a single use can entrap biological components on or within the structure or the associated catheter tube. Despite cleaning and subsequent sterilization, the presence of entrapped biological components can lead to unacceptable pyrogenic reactions.

As a result, following first use, the structure can not be relied upon to reach its desired configuration during subsequent use and may not otherwise meet established performance and sterilization specifications. The effects of material stress and damage caused during a single use, coupled with the possibility of pyrogen reactions even after

US 6,623,505 B2

15

resterilization, reasonably justify imposing a single use restriction upon devices which carry these expandable structures for deployment in bone.

To protect patients from the potential adverse consequences occasioned by multiple use, which include disease transmission, or material stress and instability, or decreased or unpredictable performance, the invention also provides a kit 500 (see FIGS. 24 and 25) for storing a single use probe 502, which carries an expandable structure 504 described herein prior to deployment in bone.

In the illustrated embodiment (see FIGS. 24 and 25), the kit 500 includes an interior tray 508. The tray 508 holds the probe 502 in a lay-flat, straightened condition during sterilization and storage prior to its first use. The tray 508 can be formed from die cut cardboard or thermoformed plastic material. The tray 508 includes one or more spaced apart tabs 510, which hold the catheter tube 503 and expandable structure 504 in the desired lay-flat, straightened condition. As shown, the facing ends of the tabs 510 present a nesting, serpentine geometry, which engages the catheter tube 503 essentially across its entire width, to securely retain the catheter tube 503 on the tray 508.

The kit 500 includes an inner wrap 512, which is peripherally sealed by heat or the like, to enclose the tray 508 from contact with the outside environment. One end of the inner wrap 512 includes a conventional peal-away seal 514 (see FIG. 25), to provide quick access to the tray 508 upon instance of use, which preferably occurs in a sterile environment, such as within an operating room.

The kit 500 also includes an outer wrap 516, which is also peripherally sealed by heat or the like, to enclosed the inner wrap 512. One end of the outer wrap 516 includes a conventional peal-away seal 518 (see FIG. 25), to provide access to the inner wrap 512, which can be removed from the outer wrap 516 in anticipation of imminent use of the probe 502, without compromising sterility of the probe 502 itself.

Both inner and outer wraps 512 and 516 (see FIG. 25) each includes a peripherally sealed top sheet 520 and bottom sheet 522. In the illustrated embodiment, the top sheet 520 is made of transparent plastic film, like polyethylene or MYLAR™ material, to allow visual identification of the contents of the kit 500. The bottom sheet 522 is made from a material that is permeable to EtO sterilization gas, e.g., TYVEC™ plastic material (available from DuPont).

The sterile kit 500 also carries a label or insert 506, which includes the statement "For Single Patient Use Only" (or comparable language) to affirmatively caution against reuse of the contents of the kit 500. The label 506 also preferably affirmatively instructs against resterilization of the probe 502. The label 506 also preferably instructs the physician or user to dispose of the probe 502 and the entire contents of the kit 500 upon use in accordance with applicable biological waste procedures. The presence of the probe 502 packaged in the kit 500 verifies to the physician or user that probe 502 is sterile and has not been subjected to prior use. The physician or user is thereby assured that the expandable structure 504 meets established performance and sterility specifications, and will have the desired configuration when expanded for use.

The features of the invention are set forth in the following claims.

We claim:

1. A device for deployment into bone comprising
an outer catheter tube having a distal end,
an inner catheter tube extending at least in part within the outer catheter tube and having a distal end region that extends at least in part beyond the distal end of the outer catheter tube,

16

an inflatable structure having a proximal end secured to the outer catheter tube and a distal end secured to the inner catheter tube, the inflatable structure extending outside and beyond the outer catheter tube and at least partially enclosing the inner catheter tube, and
a flow passage between the outer and inner catheter tubes communicating with the inflatable structure and adapted to convey an inflation medium into the inflatable structure to inflate the inflatable structure.

2. A device according to claim 1
wherein the outer catheter tube has an axis, and
wherein inflation of the inflatable structure is asymmetric about the axis.

3. A device according to claim 1
wherein the inflatable structure is adapted and configured to compress cancellous bone upon inflation of the inflatable structure in bone.

4. A device according to claim 1
wherein the inner catheter tube is moveable in relation to the outer catheter tube.

5. A device for deployment into bone comprising
an outer catheter tube having a distal end,
an inner catheter tube extending at least in part within the outer catheter tube and having a distal end region that extends at least in part beyond the distal end of the outer catheter tube,
an inflatable structure having a proximal end secured to the outer catheter tube and a distal end secured to the inner catheter tube, the inflatable structure extending outside and beyond the outer catheter tube and at least partially enclosing the inner catheter tube, the inflatable structure being sized and configured for passage within a cannula into bone when the inflatable structure is in a collapsed condition, and
a flow passage between the outer and inner catheter tubes communicating with the inflatable structure and adapted to convey an inflation medium into the inflatable structure to expand the inflatable structure.

6. A device according to claim 5
wherein the outer catheter tube has an axis, and
wherein inflation of the inflatable structure is asymmetric about the axis.

7. A device according to claim 5
wherein the inflatable structure is adapted and configured to compress cancellous bone upon inflation of the inflatable structure in bone.

8. A device according to claim 5
wherein the inner catheter tube is moveable in relation to the outer catheter tube.

9. A system for treating bone comprising
a cannula,
an outer catheter tube having a distal end,
an inner catheter tube extending at least in part within the outer catheter tube and having a distal end region that extends at least in part beyond the distal end of the outer catheter tube,
an inflatable structure having a proximal end secured to the outer catheter tube and a distal end secured to the inner catheter tube, the inflatable structure extending outside and beyond the outer catheter tube and at least partially enclosing the inner catheter tube, the inflatable structure being sized and configured for passage within the cannula into bone, and

US 6,623,505 B2

17

a flow passage between the outer and inner catheter tubes communicating with the inflatable structure and adapted to convey an inflation medium into the inflatable structure to expand the inflatable structure.

10. A system according to claim 9

wherein the outer catheter tube has an axis, and

wherein inflation of the inflatable structure is asymmetric about the axis.

18

11. A system according to claim 9

wherein the inflatable structure is adapted and configured to compress cancellous bone upon inflation of the inflatable structure in bone.

12. A system according to claim 9

wherein the inner catheter tube is moveable in relation to the outer catheter tube.

* * * * *

US006979341B2

(12) **United States Patent**
Scribner et al.

(10) Patent No.:     **US 6,979,341 B2**
(45) Date of Patent:     *Dec. 27, 2005

(54) **EXPANDABLE PREFORMED STRUCTURES FOR DEPLOYMENT IN INTERIOR BODY REGIONS**

(75) Inventors: **Robert M Scribner**, Los Altos, CA (US); **Karen D Talmadge**, Palo Alto, CA (US)

(73) Assignee: **Kyphon Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/837,350**

(22) Filed: **Apr. 18, 2001**

(65) **Prior Publication Data**

**Related U.S. Application Data**

(63) Continuation of application No. 09/088,459, filed on Jun. 1, 1998, now abandoned, and a continuation-in-part of application No. 08/788,786, filed on Jan. 23, 1997, now Pat. No. 6,235,043, which is a continuation of application No. 08/188,224, filed on Jan. 26, 1994, now abandoned.

(51) Int. Cl.⁷ ............................................. A61M 29/00
(52) U.S. Cl. ..................... 606/192; 606/61; 623/17.11; 623/23.67
(58) Field of Search ................................ 606/192, 193, 606/194, 195, 60, 61, 191; 623/17.11, 17.12, 623/23.11, 23.67; 604/95, 96, 95.03, 96.01

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,849,002 A     8/1958    Oddo

| | | | |
|---|---|---|---|
| 3,045,677 A | * | 7/1962 | Wallace ................. 604/101.05 |
| 3,154,077 A | | 10/1964 | Cannon |
| 3,640,282 A | | 2/1972 | Kamen et al. |
| 3,648,294 A | * | 3/1972 | Shahrestani .............. 623/23.42 |
| 3,779,239 A | | 12/1973 | Fischer et al. |
| 3,850,176 A | * | 11/1974 | Gottschalk ................. 604/907 |
| 3,889,685 A | | 6/1975 | Miller Jr. et al. |
| 4,261,339 A | | 4/1981 | Hanson et al. |
| 4,292,974 A | | 10/1981 | Fogarty et al. |
| 4,327,736 A | | 5/1982 | Inoue |
| 4,338,942 A | | 7/1982 | Fogarty |
| 4,402,307 A | | 9/1983 | Hanson et al. |
| 4,467,790 A | | 8/1984 | Schiff |
| 4,531,512 A | | 7/1985 | Wolvek et al. |
| 4,848,344 A | | 7/1989 | Sos et al. |
| 4,917,088 A | | 4/1990 | Crittenden |
| 4,969,888 A | | 11/1990 | Scholten et al. |
| 4,983,167 A | | 1/1991 | Sahota |
| 5,102,390 A | | 4/1992 | Crittenden et al. |
| 5,104,376 A | | 4/1992 | Crittenden |
| 5,108,404 A | | 4/1992 | Scholten et al. |
| 5,163,989 A | * | 11/1992 | Campbell et al. ............. 65/110 |
| 5,295,994 A | * | 3/1994 | Bonutti ....................... 604/103 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP     0 566 684     6/1987

(Continued)

*Primary Examiner*—Henry Bennett
*Assistant Examiner*—Andrea M. Ragonese
(74) *Attorney, Agent, or Firm*—Ryan Kromholz & Manion, S.C.

(57) **ABSTRACT**

An expandable structure made from an elastomer material is preformed to a desired geometry by exposure to heat and pressure. The structure undergoes controlled expansion and further distention in cancellous bone, with controlled deformation and without stress failure.

**15 Claims, 10 Drawing Sheets**



**US 6,979,341 B2**
Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,352,199 A | * | 10/1994 | Tower | 604/103.07 |
| 5,415,635 A | | 5/1995 | Bagaoisan et al. | |
| 5,500,181 A | * | 3/1996 | Wang et al. | 264/532 |
| 5,587,125 A | | 12/1996 | Roychowdhury | |
| 5,741,282 A | | 4/1998 | Anspach, III et al. | |
| 5,766,151 A | | 6/1998 | Valley et al. | |
| 5,827,289 A | | 10/1998 | Reiley et al. | |
| 5,843,116 A | * | 12/1998 | Crocker et al. | 606/192 |
| 5,938,582 A | | 8/1999 | Ciamacco, Jr. et al. | |
| 5,972,015 A | | 10/1999 | Scribner et al. | |
| 6,048,346 A | | 4/2000 | Reiley et al. | |
| 6,066,154 A | | 5/2000 | Reiley et al. | |
| D439,980 S | | 4/2001 | Reiley et al. | |
| 6,235,043 B1 | | 5/2001 | Reiley et al. | |
| 6,241,734 B1 | | 6/2001 | Scribner et al. | |
| 6,248,110 B1 | | 6/2001 | Reiley et al. | |
| 6,379,373 B1 | * | 4/2002 | Sawhney et al. | 606/193 |
| 6,383,212 B2 | * | 5/2002 | Durcan et al. | 606/108 |
| 6,607,544 B1 | * | 8/2003 | Boucher et al. | 606/192 |

### FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | 0 274 411 | 7/1988 | | |
| EP | 0 597 465 | 9/1988 | | |
| EP | 0 135 990 | 9/1990 | | |
| EP | 0 410 072 | 1/1991 | | |
| EP | 0 436 501 | 4/1993 | | |
| EP | 0 420 488 | 7/1993 | | |
| EP | 0 439 202 | 9/1993 | | |
| EP | 0 592 885 | 9/1993 | | |
| EP | 0 318 919 | 1/1994 | | |
| EP | 0 383 794 | 6/1994 | | |
| EP | 0 355 937 | 11/1995 | | |
| EP | 0 713 712 | 5/1996 | | |
| EP | 0 730 879 | 9/1996 | | |
| EP | 0 531 117 | 1/1997 | | |
| EP | 0 362 826 | 5/1997 | | |
| EP | 0 779 062 | 6/1997 | | |
| EP | 0 826 395 | 3/1998 | | |
| EP | 0 834 293 | 4/1998 | | |
| WO | WO 89/02763 | 4/1989 | | |
| WO | WO91/17788 | 11/1991 | | |
| WO | WO 92/11892 | 7/1992 | | |
| WO | WO92/19440 | 11/1992 | | |
| WO | WO94/02197 | 2/1994 | | |
| WO | WO95/20362 | 8/1995 | | |
| WO | WO95/22367 | 8/1995 | | |
| WO | WO 9520362 A1 | * 8/1995 | | A61B 17/68 |
| WO | WO96/04951 | 2/1996 | | |
| WO | WO96/12516 | 5/1996 | | |
| WO | WO96/39970 | 12/1996 | | |
| WO | WO97/03716 | 2/1997 | | |
| WO | WO97/17098 | 5/1997 | | |
| WO | WO97/17099 | 5/1997 | | |
| WO | WO97/40877 | 11/1997 | | |
| WO | WO98/03218 | 1/1998 | | |
| WO | WO 9856301 A1 | * 12/1998 | | A61B 17/56 |
| WO | WO 99/29246 | 6/1999 | | |
| WO | WO 99/37212 | 7/1999 | | |
| WO | WO 99/51149 | 10/1999 | | |
| WO | WO 99/62416 | 12/1999 | | |
| WO | WO 01/28439 | 4/2001 | | |
| WO | WO 01/76514 | 10/2001 | | |

* cited by examiner



*FIG. 1*



*FIG. 2*



*FIG. 4B*





*FIG. 5*

*FIG.6*

*FIG. 7*

*FIG. 8*



*FIG. 9*



*FIG. 10*



VOLUME (DIAMETER)

*FIG. 11*



*FIG. 12*



*FIG. 13*





FIG. 14

## FIG. 15





*FIG. 16*

US 6,979,341 B2

1

# EXPANDABLE PREFORMED STRUCTURES FOR DEPLOYMENT IN INTERIOR BODY REGIONS

This application is a continuation of application Ser. No. 09/088,459, filed Jun. 1, 1998 (now abandoned). This application is also a continuation-in-part of application Ser. No. 08/788,786, filed Jan. 23, 1997 (now U.S. Pat. No. 6,235, 043), which is a continuation of application Ser. No. 08/188, 224, filed Jan. 26, 1994 (now abandoned).

## FIELD OF THE INVENTION

The invention relates to expandable structures, which, in use, are deployed in interior body regions of humans and other animals.

## BACKGROUND OF THE INVENTION

The deployment of expandable structures, generically called "balloons," into cancellous bone is known. For example, U.S. Pat. Nos. 4,969,888 and 5,108,404 disclose apparatus and methods using expandable structures in cancellous bone for the fixation of fractures or other osteoporotic and non-osteoporotic conditions of human and animal bones.

## SUMMARY OF THE INVENTION

When deployed in cancellous bone, expandable structures should undergo expansion and distention without failure. Furthermore, such structures, when distended, should generally match the geometry of the interior bone space in which the structure is deployed. In addition, such structures should allow preferential expansion to areas of lowest bone density. Exposure to cancellous bone also requires materials that exhibit superior resistance to surface abrasion and tensile stresses.

It is has been discovered that expandable structures made from an elastomer material, e.g., polyurethane, which have been preformed to a desired shape, e.g., by exposure to heat and pressure, can undergo controlled expansion and further distention in cancellous bone, without failure, while exhibiting superior resistance to surface abrasion and puncture when contacting cancellous bone.

Features and advantages of the inventions are set forth in the following Description and Drawings, as well as in the appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a coronal view of a vertebral body;

FIG. 2 is a lateral view of the vertebral body shown in FIG. 1;

FIG. 3 is a plan view of a tool which carries at its distal end an expandable structure that embodies features of the invention;

FIGS. 4A and 4B are enlarged side views of the expandable structure carried by the tool shown in FIG. 3;

FIG. 5 is a perspective end view of a tube made of a polyurethane or elastomer material prior to being formed into the expandable structure shown in FIG. 4A;

FIG. 6 is a top perspective view of the tube shown in FIG. 5 positioned in a shape-forming fixture, of which parts are broken away to permit viewing its interior;

2

FIG. 7 is a top perspective view of the shape-forming fixture shown in FIG. 6, in use applying heat and pressure to a region of the tube to form a shaped, expandable region;

FIG. 8 is a coronal view of the vertebral body shown in FIG. 1, with the tool shown in FIG. 3 deployed to compress cancellous bone as a result of inflating the expandable structure;

FIG. 9 is a coronal view of the vertebral body shown in FIG. 8, upon removal of the tool, showing the cavity formed by the compression of cancellous bone by the expandable structure;

FIG. 10 is a graph which plots the effects of increasing pressure applied to the interior of the structure to the expanded volume of the structure;

FIG. 11 is a coronal view of the vertebral body shown in FIG. 8, with the tool deployed to compress cancellous bone, and in which a bendable stylet alters the orientation of the expandable structure in cancellous bone;

FIG. 12 is a side view of a complex structure which includes several expandable segments spaced along its length;

FIG. 13 is a top perspective view of a shape-forming fixture used to apply pressure and heat to an extruded or molded tube to create the structure shown in FIG. 12;

FIG. 14 is a top view of a kit which holds the tool shown in FIG. 3 in a sealed, sterile environment prior to use;

FIG. 15 is an exploded view of the kit shown in FIG. 14; and

FIG. 16 is a side view, partly in section, of a composite expandable structure.

The invention may be embodied in several forms without departing from its spirit or essential characteristics. The scope of the invention is defined in the appended claims, rather than in the specific description preceding them. All embodiments that fall within the meaning and range of equivalency of the claims are therefore intended to be embraced by the claims.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The preferred embodiment describes improved systems and methods that embody features of the invention in the context of treating bones. This is because the new systems and methods are advantageous when used for this purpose. However, aspects of the invention can be advantageously applied for diagnostic or therapeutic purposes in other areas of the body.

The new systems and methods will be more specifically described in the context of the treatment of human vertebra. Of course, other human or animal bone types can be treated in the same or equivalent fashion.

FIG. 1 shows a coronal (top) view of a human lumbar vertebra 12. FIG. 2 shows a lateral (side) view of the vertebra. The vertebra 12 includes a vertebral body 26, which extends on the anterior (i.e., front or chest) side of the vertebra 12. The vertebral body 26 is shaped generally like a marshmallow.

As FIGS. 1 and 2 show, the vertebral body 26 includes an exterior formed from compact cortical bone 28. The cortical bone 28 encloses an interior volume of reticulated cancellous, or spongy, bone 32 (also called medullary bone or trabecular bone).

The spinal canal 36 (see FIG. 1), is located on the posterior (i.e., back) side of each vertebra 12. The spinal cord (not shown) passes through the spinal canal 36. The vertebral arch 40 surrounds the spinal canal 36. Left and

US 6,979,341 B2

3

right pedicles 42 of the vertebral arch 40 adjoin the vertebral body 26. The spinous process 44 extends from the posterior of the vertebral arch 40, as do the left and right transverse processes 46.

It may be indicated, due to disease or trauma, to compress cancellous bone within the vertebral body. The compression, for example, can be used to form an interior cavity, which receives a filling material, e.g., a flowable material that sets to a hardened condition, like bone cement, allograft tissue, autograft tissue, hydroxyapatite, or synthetic bone substitute, as well as a medication, or combinations thereof, to provide improved interior support for cortical bone or other therapeutic functions, or both. The compaction of cancellous bone also exerts interior force upon cortical bone, making it possible to elevate or push broken and compressed bone back to or near its original prefracture, or other desired, condition.

I. Preformed Expandable Structures

FIG. 3 shows a tool 48 for accessing bone for the purpose of compacting cancellous bone. The tool 48 includes a catheter tube 50 having a proximal end 52 and a distal end 54. The proximal end 52 carries a handle 14 to facilitate gripping and maneuvering the tube 50. The proximal end 52 also carries a fitting 122 to enable connection of the tool 48 to external equipment, as will be described later. The distal end 54 of the tool 48 carries a structure 56, which, in use, is intended to be expanded in cancellous bone, e.g., in the vertebral body 26 shown in FIGS. 1 and 2.

A. Desired Physical and Mechanical Properties

The material from which the structure 56 is made should possess various physical and mechanical properties to optimize its functional capabilities to compact cancellous bone. The three most important properties are the ability to expand its volume; the ability to deform in a desired way when expanding and assume a desired shape inside bone; and the ability to withstand abrasion, tearing, and puncture when in contact with cancellous bone.

1. Expansion Property

A first desired property for the structure material is the ability to expand or otherwise increase its volume without failure. This property enables the structure 56 to be deployed in a collapsed, low profile condition subcutaneously, e.g., through a cannula, into the targeted bone region. This property also enables the expansion of the structure 56 inside the targeted bone region to press against and compress surrounding cancellous bone, or move cortical bone to a prefracture or other desired condition, or both.

The expansion property for the material can be characterized, e.g., by ultimate elongation properties, which indicate the greatest degree of expansion that the material can accommodate prior to failure. An ultimate elongation of at least about 300% before material failure provides the ability to expand to the volume necessary to compact cancellous bone, as well as lift contiguous cortical bone. A material with an ultimate elongation of less than about 300% is prone to exhibit failure at inflation volumes short of the desired bone compacting volume.

2. Shape Property

A second desired property for the material of the structure 56 is the ability to predictably deform during expansion, so that the structure 56 consistently achieves a desired shape inside bone.

The shape of the structure 56, when expanded in bone, is selected by the physician, taking into account the morphology and geometry of the site to be treated. The shape of the cancellous bone to be compressed, and the local structures

4

that could be harmed if bone were moved inappropriately, are generally understood by medical professionals using textbooks of human skeletal anatomy along with their knowledge of the site and its disease or injury, and also taking into account the teachings of U.S. patent application Ser. No. 08/788,786, filed Jan. 23, 1997, and entitled "Improved Inflatable Device for Use in Surgical Protocol Relating to Fixation of Bone," which is incorporated herein by reference. The physician is also able to select the desired expanded shape inside bone based upon prior analysis of the morphology of the targeted bone using, for example, plain film x-ray, fluoroscopic x-ray, or MRI or CT scanning. The expanded shape inside bone is selected to optimize the formation of a cavity that, when filled with a selected material, provides support across the region of the bone being treated. The selected expanded shape is made by evaluation of the predicted deformation that will occur with increased volume due to the shape and physiology of the targeted bone region.

In some instances, it is desirable, when creating a cavity, to also move or displace the cortical bone to achieve the desired therapeutic result. Such movement is not per se harmful, as that term is used in this Specification, because it is indicated to achieve the desired therapeutic result. By definition, harm results when expansion of the structure 56 results in a worsening of the overall condition of the bone and surrounding anatomic structures, for example, by injury to surrounding tissue or causing a permanent adverse change in bone biomechanics.

As one general consideration, in cases where the bone disease causing fracture (or the risk of fracture) is the loss of cancellous bone mass (as in osteoporosis), the selection of the expanded shape of the structure 56 inside bone should take into account the cancellous bone volume which should be compacted to achieve the desired therapeutic result. An exemplary range is about 30% to 90% of the cancellous bone volume, but the range can vary depending upon the targeted bone region. Generally speaking, compacting less of the cancellous bone volume leaves more uncompacted, diseased cancellous bone at the treatment site.

Another general guideline for the selection of the expanded shape of the structure 56 inside bone is the amount that the targeted fractured bone region has been displaced or depressed. The controlled deformation diameter expansion of the structure 56 within the cancellous bone region inside a bone can elevate or push the fractured cortical wall back to or near its anatomic position occupied before fracture occurred. Generally speaking, inadequate compaction of cancellous bone results in less lifting of contiguous cortical bone.

For practical reasons, it is desired that the expanded shape of the structure 56 inside bone, when in contact with cancellous bone, substantially conforms to the shape of the structure 56 outside bone, when in an open air environment. This allows the physician to select in an open air environment a structure having an expanded shape desired to meet the targeted therapeutic result, with the confidence that the expanded shape inside bone will be similar in important respects.

An optimal degree of shaping can be achieved by material selection and by special manufacturing techniques, e.g., thermoforming or blow molding, as will be described in greater detail later.

3. Toughness Property

A third desired property for the material of the structure 56 is the ability to resist surface abrasion, tearing, and puncture when in contact with cancellous bone.

US 6,979,341 B2

5

This property can be characterized in various ways. For example, a Taber Abrasion Resistance Value of less than about 90 mg loss indicates resistance to puncture when contacting cancellous bone. A Rotating Drum Abrasion Resistance Value of less than 70 mm³ also indicates resistance to puncture when contacting cancellous bone. This property can further be characterized, e.g., by an Elmendorf tear strength of greater than about 280 lbf/in, which indicates resistance to failure caused by cancellous bone abrasion. This property can also be characterized, e.g., by a Shore Hardness value of less than about 100 A. This value indicates a degree of elasticity, flexibility, and ductility.

Materials with a Taber Abrasion Resistance Value greater than about 90 mg loss, or a Rotating Drum Abrasion Resistance Value greater than about 70 mm³, or an Elmendorf tear strength value of less than about 280 lbf/in, or a Shore Hardness value greater than about 100 A are not well suited for expansion in cancellous bone, because failure may occur prior to expansion to the desired diameter.

B. Enhanced Expansion and Shape Properties

The expansion and shape properties just described can be enhanced and further optimized for compacting cancellous bone by selecting an elastomer material, which also possess the capability of being preformed, i.e., to acquire a desired shape by exposure, e.g., to heat and pressure, e.g., through the use of conventional thermoforming or blow molding techniques. Candidate materials that meet this criteria include polyurethane, silicone, thermoplastic rubber, nylon, and thermoplastic elastomer materials. In a most preferred embodiment, polyurethane material is used.

1. Single Preformed Expandable Structures

In the embodiment shown in FIG. 4A, the structure 56 comprises an elongated tube 16 made from a polyurethane material. The tube 16 possesses end regions 18 and 20, each having a first diameter (designated D1 in FIG. 4A). The tube 16 further includes an intermediate preformed region 22. The diameter of the preformed intermediate region 22 has been enlarged by exposure to heat and pressure to a normally expanded shape having an enlarged diameter (designated D3 in FIG. 4A) greater than the first diameter D1. The normally expanded shape D3 exists in an open air environment, prior to placement inside an interior body region.

As FIG. 5 shows, the tube 16 is initially formed from polyurethane (or another preferred) material, for example, by standard polymer extrusion and molding processes. As FIGS. 6 and 7 show, the shaped region 22 is created by exposing the region 22 to heat within a fixture or mold 10, while positive interior pressure is applied to the tube 16 within the region 22. The fixture 10 includes a cavity 24, in which the region 22 rests while heat and pressure are applied. The cavity 24 has a geometry that the region 22 is intended to assume when inflated with interior pressure in the fixture 10. In the illustrated embodiment, a generally spherical shape is envisioned.

The heat can be applied by coupling the cavity 24 to a source 120 of heat energy of the fixture 10 itself (as FIG. 7 shows), or conveying a hot air stream or the equivalent into the cavity 24. The temperature selected is that at which the tube material will soften and form.

The range of temperatures in which softening occurs will depend upon the particular composition of the polymeric material used. For example, for polyurethane, the softening temperature lays in the range of about 50° C. to about 190° C. An operating range of softening temperatures for a given plastic material can be empirically determined.

As FIG. 7 shows, while in a heat-softened state and confined within the cavity 24, one end region 18 is coupled

6

to a source 34 of pressurized fluid. The other end region 20 not coupled to the source 34 is closed with a cap 122 or otherwise blocked to retain pressurized fluid in the tube 16. Preferably, the pressurized fluid is air or an inert gas, designated A in FIG. 7.

The magnitude of pressure will vary depending upon the wall thickness and other physical characteristics of the elastomer material used. The pressure must be less than the burst strength of the tube material. Typically, air pressure in the range of 5 to 1000 psi can be used.

The introduction of pressurized air A into the tube 16 causes the heat-softened region 22 to expand or billow outwardly in the cavity 24, as FIG. 7 shows. The cavity 24 limits the extent to which the heat-softened region 22 can expand. The region 22 will, upon expansion, conform to the geometry of the cavity 24. The extension of the heat-softened material in the cavity 24 uniformly relieves material stress in the region 22, as the region 22 acquires a new expanded shape, having the enlarged diameter D3 shown in FIG. 4A.

The application of heat is terminated, and the region 22 is allowed to cool, while pressurized fluid is applied to maintain the enlarged diameter D3. The region 22 can be cooled by an ambient external air flow, or by a pressurized stream of cooling air. Alternatively, the cavity 24 can include interior passages through which a cooling fluid can be circulated. The speed at which cooling occurs affects the time of the overall process.

After cooling, the application of pressurized fluid is terminated. The now preformed structure 56 is removed from the cavity 24.

The normally expanded shape characteristics of the structure 56 can be achieved by other techniques. For example, the structure 56 can be formed by dipping, lost wax casting, or injection molding.

Upon removal from the fixture 10, the structure 56 is secured to the distal end 54 of the catheter tube 50. The structure of the catheter tube 50 can vary and is not critical to the invention per se. The materials for the catheter tube 50 are selected to facilitate advancement of the structure 56 into an interior body region. The catheter tube 50 can be constructed, for example, using standard flexible, medical grade plastic materials, like vinyl, nylon, polyethylenes, ionomer, polyurethane, and polyethylene tetraphthalate (PET). The catheter tube 50 can also include more rigid materials to impart greater stiffness and thereby aid in its manipulation. More rigid materials that can be used for this purpose include Kevlar™ material, PEBAX™ material, stainless steel, nickel-titanium alloys (Nitinol™ material), and other metal alloys.

In the illustrated embodiment (as best shown in FIG. 4A), the catheter tube 50 includes an interior bore 60, in which an auxiliary tube 58 is secured. It should be appreciated that the catheter tube 50 can have more than a single interior lumen, and can, e.g., have an array of multiple lumens. In the illustrated embodiment, the auxiliary tube 58 extends through the interior bore 60 and beyond the distal end 54 of the catheter tube 50. One end region 18 of the tube 16 is secured to the distal end 54 of the catheter tube 50, while the other end region 20 is secured to the free extended end 62 of the auxiliary tube 58. The end regions 18 and 20 can be secured, e.g., using adhesive or thermal bonding processes.

By drawing a vacuum (i.e., negative pressure) inside the structure 56, resident air volume is removed, and the diameter of the region 22 is diminished from its normally expanded shape D3 to a substantially collapsed, and not inflated diameter D2. The collapsed diameter D2 is, due to

US 6,979,341 B2

7                                          8

forming during the heat and pressure shaping process, still different than the extruded or molded diameter D1. When substantially collapsed or not inflated, the structure 56 exhibits a low profile, ideal for insertion into the targeted cancellous bone region. The low profile can be further reduced to aid insertion, if desired, by enclosing the structure 56 within a constricted introducing sleeve, or by coating the structure 56 with a lubricious material, such as silicone, or both.

As FIGS. 3 and 4 show, the interior bore 60 of the catheter tube 50 can be coupled (via the fitting 122) to a source 68 of fluid, for example, sterile saline, or a radiopaque contrast medium, which permits x-ray visualization of the structure 56. The interior bore 60 conveys the fluid into the region 22. The increase of volume within the region up to a given threshold amount (designated V(D3) in FIG. 10) will return the intermediate region 22 from the collapsed diameter D2 to the normal (i.e., enlarged, but not distended) geometry, having the shape and diameter D3.

When in its normally enlarged shape D3, the material of the structure 56 in the region 22 is not significantly stretched or stressed, because it has been previously expanded in a stress-relieved condition into this geometry in the cavity 24.

The magnitude of the radius of expansion (and thus diameter D3) depends upon the relative increase in diameter in the region 22 brought about by exposure to heat and interior pressure within the cavity 24. The relative increase between the extruded or molded tube diameter D1 and diameter D3 should be at least 5% to provide tube length and geometry of the segment when it expands beyond diameter D3.

As FIG. 4B shows, due to expansion of heat-softened material under pressure in the cavity 24, the wall thickness of the structure 56 is not uniform. The region 22 has a minimum wall thickness T3 when in its normally enlarged diameter D3, which is less than the normal extruded or molded wall thickness (T1) of the tube 16.

Continued volume flow of pressurized fluid into the structure 56 at the threshold pressure P(t) continues to increase the interior volume of the structure 56. As its volume increases, the shaped region 22 of the structure 56 continues to enlarge beyond the normal diameter D3 toward a distended shape and geometry, designated D4 in FIG. 4. The threshold pressure P(t) stays generally constant as volume increases between D3 and D4. As long as volume is controlled (i.e., so as not to substantially exceed D4), there is no need for an external pressure regulator. Volume expansion between D3 and D4 at a substantially constant pressure occurs because of the material properties of the structure 56, and not because of some external pressure control mechanism.

Enlargement of the structure in the region between D3 and D4 stretches the material in the region 22 beyond its stress-relieved condition. Consequently, the wall thickness T4 at the distended geometry D4 is less than the minimum wall thickness T3 of the normally enlarged diameter D3. However, the distended geometry generally maintains the preformed shape dictated by the cavity 24 (which, in the illustrated embodiment, is spherical).

In the expansion region between D3 and D4, the addition of fluid volume at substantially constant P(t) stretches the material, causing the radius of the structure 56 to increase and the wall thickness to decrease. Material stress will increase.

While expanding in the region between D3 and D4, the structure 56, when inside bone, assumes an increasingly larger surface and volume, thereby compacting surrounding cancellous bone. Inflation in cancellous bone may occur at the same threshold pressure P(t) as outside bone. However, an increase in the threshold inflation pressure P(t) inside bone may be required, due to the density of the cancellous bone and resistance of the cancellous bone to compaction. In this instance, the configuration of the Pressure vs. Volume curve for a given material and structure 56 remains essentially the same as shown in FIG. 10, except that the generally horizontal portion of the curve between D3 and D4 is shifted upward on the Y-axis, as shown in phantom lines in FIG. 10. As a general statement, the threshold pressure inside bone is determined by the material property of the structure 56 and any added resistance due to the presence of cancellous bone.

The distance between D3 and D4, along the x-axis of FIG. 10, defines the degree to which the wall can elongate at a substantially constant pressure condition and with increasing material stress to compact cancellous bone, without failure. As volume increases at the substantially constant threshold pressure P(t), wall failure becomes more likely as the diameter of the structure enlarges significantly further beyond the distended diameter D4. There comes a point when the structure 56 can no longer increase its volume as the material elasticity approaches ultimate elongation, or as material stress approaches ultimate tensile strength. When either of these ultimate values are reached, wall failure is likely.

The distance between D3 and D4 in FIG. 10 during expansion inside bone is a simultaneous expression of the three physical and mechanical properties—expansion, shape, and toughness—described above. For example, a material possessing the requisite elasticity and shape, but lacking requisite toughness, but may fail short of the shape D4 due to abrasion and tearing caused by cancellous bone.

2. Complex Preformed Expandable Structures

Sometimes it can be difficult to achieve a desired uniformity and area of compaction within a given cancellous bone region using a expandable body 56 having a single expandable region 22, such as shown in FIG. 4.

FIG. 12 shows a complex preformed structure 80 includes segmented expandable regions 82 and 84 spaced along its length. The structure 80 provides a longer profile along which volume can be increased.

The complex expandable structure 80 is created by extruding or molding a tube 86 of polyurethane or elastomer material, like the tube 16 shown in FIG. 5. In the preferred embodiment, the tube 86 is made of a polyurethane material. The tube has a normal extruded wall thickness (T5) and a normal extruded outside diameter (D5) (as shown in FIG. 12).

The segmented shaped regions 82 and 84 are created by exposing an intermediate region 88 of the tube 86 to heat and positive interior pressure inside a fixture or mold 90, as shown in FIG. 13. In the illustrated embodiment, the fixture 90 possesses two cavity regions 92 and 94 with an intermediate channel 96. The intermediate region 88 is located in the cavities 92 and 94 and channel 96.

The cavity regions 92 and 94 and the channel 96 are exposed to a source of heat 120, to soften the material of the region 88. When heat-softened (in the manner previously described), the interior of the tube 86 is subjected to positive pressure from a source 34 (as also previously described). The material in the region 88 expands or extends within the cavities 92 and 94 and the channel 96. Once cooled and removed from the fixture 90, the structure 80 can be attached to the distal end of a catheter tube 50 in the same fashion as the structure 56 shown in FIGS. 3 and 4.

US 6,979,341 B2

9

10

The structure 80 possesses, in an open air environment, a normal expanded shape, having diameter D7 (shown in phantom lines in FIG. 12). The normal shape and diameter D7 for the regions 82 and 84 generally correspond with the shape and dimension of the cavities 92 and 94, respectively.

When an interior vacuum is drawn, removing air from the structure 80, the structure 80 assumes a substantially collapsed, and not inflated geometry, shown in phantom lines D6 in FIG. 12. Due to the application of heat and pressure upon the region 88, the diameter D6 for each region 82 and 84 is larger than the normal extruded or molded outside diameter D5 of the original extruded tube 86.

The regions 82 and 84 are separated by a tubular neck 98, which segments the structure 80 into two expandable regions 82 and 84. When substantially collapsed under vacuum or not inflated, the structure 80 exhibits a low profile, ideal for insertion into the targeted cancellous bone region.

The introduction of fluid volume back into the tube 86 will cause each region 82 and 84 to return from the collapsed diameter D6 back to the normal, enlarged, but not distended geometry, having the shape and diameter shown in phantom lines D7 in FIG. 12.

In the illustrated embodiment, the first and second shaped regions 82 and 84 have generally the same radius of expansion and thus the same non-distended shape and diameter D7. Alternatively, each region 82 and 84 can have a different radius of expansion, and thus a different non-distended shape and diameter. Regardless, when in the normal, non-distended diameter D7, the material of the structure 80 in the region 88 is not significantly stretched or stressed, because the regions 82 and 84 have been previously expanded in a stress-relieved condition into this geometry in the cavities 92 and 94.

As before explained in conjunction with the structure 56, the regions 82 and 84 can be shaped by heat and interior pressure within different cavities to assume different geometries, e.g., cylindrical or elliptical geometry, or a non-spherical, non-cylindrical, or non-elliptical geometry, with either uniform or complex curvature, and in either symmetric or asymmetric forms. Of course, more than two segmented regions 82 and 84 can be formed along the length of the tube 86.

Each shaped region 82 and 84 possesses a minimum wall thickness (designed T7 in FIG. 12) when in the normally enlarged but not distended geometry D7. Due to expansion of heat-softened material under pressure in the cavities 92 and 94, the wall thickness is not uniform, i.e., T7 is less than the normal extruded or molded wall thickness T5 of the tube 86. The minimum wall thicknesses T7 for the regions 82 and 84 can be the same or different.

When in the enlarged, but not distended geometry, the neck region 98 has an outside diameter (designated D9 in FIG. 14), which is equal to or greater than the normal extruded or molded diameter D5 of the tube 86. The size of the channel 96 in the fixture 90 determines the magnitude of the diameter D9. Due to expansion of heat-softened material in the adjacent regions 82 and 84 under pressure in the cavities 92 and 94, the neck region 98 (which expands under pressure in the channel 96) has a wall thickness (designated T9 in FIG. 12) which is less than or equal to the normal extruded or molded wall thickness T5 of the tube 86, but still greater than the minimum wall thickness T7 of either fully shaped region 82 or 84.

The formed complex structure 80 thus possesses regions of non-uniform minimum wall thickness along its length; that is, T5≧T9>T7. The formed complex structure 80 also provides multiple expandable regions 82 and 84 of the same or different enlarged outside diameters (D7), segmented by a neck region 98, in which D6>D5; D7>D6; and D7>D9.

By continuing to apply fluid volume at a constant pressure at a threshold amount P(t), and thereby increasing the volume within the structure 80, the shaped regions 82 and 84 of the structure 80 will continue to enlarge beyond diameter D7 to a distended diameter, designated D8 in FIG. 12. The wall thickness T7 further decreases and approaches T8. As the regions 82 and 84 approach diameter D8, the diameter D9 of the neck region 98 will likewise increase toward diameter D10, as FIG. 12 shows, providing more uniform, elongated surface contact with cancellous bone.

Enlargement of the structure 80 beyond diameter D7 stretches the material in the regions 82, 84, and 98 beyond their stress-relieved condition, although the distended geometry of the regions 82 and 84 will, in important respects, maintain the preformed shape dictated by the cavities 92 and 94. As before explained in conjunction with the structure 56, the material in the regions 82 and 84 has already been stress-relieved in the desired shape at the normal diameter D7. As previously explained, enlargement toward the distended diameter D8 occurs at substantially constant pressure (as FIG. 10 exemplifies), and at increasing material stress.

The degree of stretching at a substantially constant incremental pressure condition can be tailored to achieve a desired, fully distended diameter D8. The final, fully distended diameter D8 can be selected to match the dimensions of the targeted cancellous bone region. The controlled stretching of the segmented regions 82 and 84 in tandem can provide an equal volume compression of cancellous bone with a major diameter that is less than a single non-segmented region (i.e., one without the neck region 98). Stated another way, segmented regions 82 and 84, when expanded to a given inflation volume, have a diameter less than a sphere expanded to an equal inflation volume.

While expanding in the region between D7 and D8, the structure 80, like the structure 56, when inside bone, assumes an increasingly larger surface and volume, thereby compacting surrounding cancellous bone. Inflation in cancellous bone may occur at the same threshold pressure P(t) as outside bone. However, an increase in the threshold inflation pressure P(t) inside bone may be required, due to the density of the cancellous bone and resistance of the cancellous bone to compaction.

3. Composite Expandable Structures

In the previous embodiments, the material of the structure 56 or 80 is selected to integrate all desired physical and mechanical requirements of expansion, shape, and toughness. FIG. 16 exemplifies a composite expandable structure 130, in which the desired physical and mechanical requirements are segregated by the use of different materials.

As shown in FIG. 16, the composite structure 130 includes an inner expandable body 132 made of a first material that meets one or more of the desired requirements of expansion and shape. The composite structure 130 includes an outer expandable body or shell 134, which is made of a second material that meets the desired requirement of toughness. The shell 134 encapsulates and protects the inner expandable body 132 from surface abrasion, tearing, or puncture due to contact with cancellous bone.

The shell 134 can comprise a material applied to the surface of the inner body by various dipping, painting, or coating techniques. Alternatively, the shell 134 can comprise a bag or sock, into which the inner body 132 is placed prior to deployment. The material for the shell 134 can comprise,

US 6,979,341 B2

11                                                                                    12

e.g., rubber, silicone, ethylene vinyl acetate, polyurethane, polyethylene, or multi-filament woven material or fabric or other polymer material.

The composite structure 130 makes it possible to isolate the expansion and shape requirements from the toughness requirement. A material completely or partially failing to meet the toughness requirement can nevertheless be used for the inner body 132 to optimize the expansion and shape requirements of the structure 130. The inner body 132 imparts its optimized expansion and shape characteristics to cancellous bone, while the shell 134 imparts its optimized toughness characteristic to the overall composite structure 130.

II. Deployment of Preformed Expandable Structures in Bone

The structure 56 or 80 or 130 can be inserted into bone in accordance with the teachings of U.S. Pat. Nos. 4,969,888 and 5,108,404, which are incorporated herein by reference. As FIG. 8 shows, access can be accomplished, for example, by drilling an access portal 64 through a side of the vertebral body 26. This is called a postero-lateral approach. Alternatively, the access portal can pass through either pedicle 42, which called a transpedicular approach.

A guide sheath or cannula 66 is placed into communication with the access portal 64. The catheter tube 50 is advanced through the cannula 66 to deploy the structure (FIG. 8 shows structure 56) into contact with cancellous bone 32. The structure 56 is in its normally collapsed and not inflated condition (shown as phantom line diameter D2 in FIG. 8) during deployment. Access in this fashion can be accomplished using a closed, minimally invasive procedure or with an open procedure.

The materials for the catheter tube 50 are selected to facilitate advancement of the expandable structure 56 into cancellous bone 32. The catheter tube 50 can be constructed, for example, using standard flexible, medical grade plastic materials, like vinyl, nylon, polyethylenes, ionomer, polyurethane, and polyethylene tetraphthalate (PET). The catheter tube 50 can also include more rigid materials to impart greater stiffness and thereby aid in its manipulation. More rigid materials that can be used for this purpose include stainless steel, nickel-titanium alloys (Nitinol™ material), and other metal alloys.

As FIG. 8 shows, expansion of the structure 56 to its enlarged but not distended geometry (phantom line diameter D3 in FIG. 8), and ultimately to its maximum distended geometry (diameter D4 in FIG. 8) sequentially compresses cancellous bone 32 in the vertebral body 26. The compression forms an interior cavity 70 in the cancellous bone 32. As FIG. 9 shows, subsequent collapse and removal of the structure 56 leaves the cavity 70 in a condition to receive a filling material, e.g., bone cement. The bone cement, when hardened, provides improved interior structural support for cortical bone 32.

The compaction of cancellous bone 32 shown in FIG. 8 also exerts interior force upon the surrounding cortical bone 28. The interior force can elevate or push broken and compressed bone back to or near its original prefracture, or other desired, condition.

In the case of a vertebral body 26, deterioration of cancellous bone 32 can cause the top and bottom plates (designated TP and BP in FIG. 2) to compress or move closed together, reducing the normal physiological height between the plates TP and BP. In this circumstance, the interior force exerted by the structure 56 as it compacts cancellous bone 32 moves one or both of the top and bottom plates TP and BP farther apart, to thereby restore a spacing between them, which is at or close to the normal physiological distance.

As shown in FIG. 11, in an alternative embodiment, a stiffening member or stylet 74 can be inserted through a lumen 72 of the auxiliary tube 58, which is enclosed within the structure 56. The stylet 74 can be made, e.g., from stainless steel or molded plastic material. The presence of the stylet 74 serves to keep the structure 56 in the desired distally straightened condition during passage through the guide sheath 66 into the targeted bone region, as FIG. 8 shows.

As further shown in FIG. 11, the stylet 74 can have a preformed memory, to normally bend its distal region. The memory is overcome to straighten the stylet 14 when confined within the guide sheath 66. However, as the structure 56 and preformed stylet 74 advance free of the guide sheath 66 and pass into the targeted region, the preformed memory bends the stylet 74. The bending stylet 74 bends the auxiliary tube 58 and thereby shifts the main axis 76 of the surrounding expandable structure 56 relative to the axis 78 of the access path (i.e., the guide sheath 66). The preformed stylet 74, positioned within the interior of the structure 56, aids in altering the orientation of the structure 56 within targeted region. It is thereby possible to orient the structure 56 in a more generally aligned relationship with the natural axes of the vertebral body 26. A cavity 70, more centrally located within the bone, e.g., a vertebral body 26, can be established, which provides more uniform support across the mid region of the vertebral body 26 when filled with bone cement. The capability of the vertebral body 26 to withstand loads is thereby enhanced. The symmetric compaction of cancellous bone 32 in the interior volume also exerts more equal and uniform interior forces upon cortical bone 32, to elevate or push broken and compressed bone.

There are times when a lesser amount of cancellous bone compaction is indicated. For example, when the bone disease being treated is localized, such as in avascular necrosis, or where local loss of blood supply is killing bone in a limited area, an expandable structure 56 or 80 or 130 can compact a smaller volume of total bone. This is because the diseased area requiring treatment is smaller.

Another exception lies in the use of an expandable structure 56 or 80 or 130 to improve insertion of solid materials in defined shapes, like hydroxyapatite and components in total joint replacement. In these cases, the structure shape and size is defined by the shape and size of the material being inserted.

Yet another exception lies in the use of expandable structures in bones to create cavities to aid in the delivery of therapeutic substances, as disclosed in copending U.S. patent application Ser. No. 08/485,394, previously mentioned. In this case, the cancellous bone may or may not be diseased or adversely affected. Healthy cancellous bone can be sacrificed by significant compaction to improve the delivery of a drug or growth factor which has an important therapeutic purpose. In this application, the size of the expandable structure 56 or 80 or 130 is chosen by the desired amount of therapeutic substance sought to be delivered. In this case, the bone with the drug inside may need to be supported by standard methods while the drug works and the bone heals.

III. Single Use

Distention of any one of the expandable structures 56 or 80 or 130 described herein during first use in a targeted body region generates stress on the material or materials which

US 6,979,341 B2

13

make up the structure. The material stress created by operational loads during first use in a targeted body region can significantly alter the preformed morphology of the structure, making future performance of the structure unpredictable.

For example, expansion within bone during a single use creates contact with surrounding cortical and cancellous bone. Regardless of the superior mechanical properties of material, this contact can in time damage the structure, creating localized regions of weakness, which may escape detection. Localized areas of lower density cancellous bone may result in creating areas of differential expansion and stress on the structure. The existence of localized regions of weakness or differential stress can unpredictably cause overall structural failure during a subsequent use.

In addition, exposure to blood and tissue during a single use can entrap biological components on or within the structure or the associated catheter tube. Despite cleaning and subsequent sterilization, the presence of entrapped biological components can lead to unacceptable pyrogenic reactions.

As a result, following first use, the structure can not be consistently relied upon to reach its desired configuration during subsequent use and may not otherwise meet established performance and sterilization specifications. The effects of material stress and damage caused during a single use, coupled with the possibility of pyrogen reactions even after resterilization, reasonably justify imposing a single use restriction upon devices which carry these expandable structures for deployment in bone.

To protect patients from the potential adverse consequences occasioned by multiple use, which include disease transmission, or material stress and instability, or decreased or unpredictable performance, the invention also provides a kit 100 (see FIGS. 14 and 15) for storing a single use tool 48 (also shown in FIG. 3) prior to use. As shown in FIG. 14, the tool 48 carries an expandable structure. FIG. 14 shows for the purpose of illustration the structure 56, as described herein. It should be appreciated that the tool 48 could carry an expandable structure 80 or 130, as also previously described.

In the illustrated embodiment (see FIGS. 14 and 15), the kit 100 includes an interior tray 108. The tray 108 holds the tool 48 in a lay-flat, straightened condition during sterilization and storage prior to its first use. The tray 108 can be formed from die cut cardboard or thermoformed plastic material. The tray 108 includes one or more spaced apart tabs 110, which hold the catheter tube 50 and expandable structure 56 in their desired lay-flat, straightened condition.

The kit 100 includes an inner wrap 112, which is peripherally sealed by heat or the like, to enclose the tray 108 from contact with the outside environment. One end of the inner wrap 112 includes a conventional peal-away seal 114, to provide quick access to the tray 108 upon instance of use, which preferably occurs in a sterile environment, such as within an operating room.

The kit 100 also includes an outer wrap 116, which is also peripherally sealed by heat or the like, to enclosed the inner wrap 112. One end of the outer wrap 116 includes a conventional peal-away seal 118, to provide access to the inner wrap 112, which can be removed from the outer wrap 116 in anticipation of imminent use of the probe 102, without compromising sterility of the probe 102 itself.

Both inner and outer wraps 112 and 116 (see FIG. 15) each includes a peripherally sealed top sheet 120 and bottom sheet 122. In the illustrated embodiment, the top sheet 120 is made of transparent plastic film, like polyethylene or

14

MYLAR™ material, to allow visual identification of the contents of the kit 100. The bottom sheet 122 is made from a material that is permeable to ETO sterilization gas, e.g., TYVEK™ plastic material (available from DuPont).

The sterile kit 100 also carries a label or insert 106, which includes the statement "For Single Patient Use Only" (or comparable language) to affirmatively caution against reuse of the contents of the kit 100. The label 106 also preferably affirmatively instructs against resterilization of the tool 48. The label 106 also preferably instructs the physician or user to dispose of the tool 48 and the entire contents of the kit 100 upon use in accordance with applicable biological waste procedures. The presence of the probe 102 packaged in the kit 100 verifies to the physician or user that tool 48 is sterile and has not been subjected to prior use. The physician or user is thereby assured that the expandable structure 56 meets established performance and sterility specifications, and will have the desired configuration when expanded for use.

The label 106 preferably also instructs the physician as to the use of the expandable structure 56 (or 80 or 130) for compacting cancellous bone in the manners previously described. For example, the label 106 instructs the physician to expand the structure inside bone to compact cancellous bone and form a cavity. The label 106 can also instruct the physician to fill the cavity with a material, e.g., bone cement, allograft material, synthetic bone substitute, a medication, or a flowable material that sets to a hardened condition.

The features of the invention are set forth in the following claims.

We claim:

1. A device comprising

a wall made from a flexible material resistant to abrasion by cancellous bone,

the wall peripherally defining an interior space and including an expandable region preformed with a normally expanded shape outside bone, the expandable region being expandable beyond its normally expanded shape to reach an inflation volume sized and configured for compacting cancellous bone,

the expandable region having proximal and distal ends,

the expandable region further having a first expanded section having an interior cross-sectional area adjacent the proximal end, a second expanded section having an interior cross-sectional area adjacent the distal end, and a third section having an interior cross-sectional area located between the first and second expanded sections,

when in the normally expanded shape and at the inflation volume, the interior cross-sectional area of the third section being less than the interior cross-sectional area of either the first or second expanded sections, and

the first expanded section, the second expanded section, and the third expanded section further having, respectively, a first preformed average wall thickness, a second preformed average wall thickness, and a third preformed average wall thickness, and

when in the normally expanded shape and at the inflation volume, the third average wall thickness being greater than either the first average wall thickness or the second average wall thickness.

2. A device according to claim 1

wherein the expandable region, when expanded beyond its normally expanded shape to reach a given inflation volume, presents a maximum diameter less than a sphere expanded to an equal inflation volume.

US 6,979,341 B2

15

3. A device according to claim 1 wherein the expandable region includes a further expanded shape, outside bone, having a diameter greater than the normally expanded shape.

4. A device according to claim 3 wherein the expandable region has a further expanded shape inside bone that substantially corresponds to the further expanded shape outside bone.

5. A device according to claim 1 wherein the expandable region is essentially cylindrical.

6. A device according to claim 1 wherein the expandable region expands in a non-spherical manner.

7. A device according to claim 1 wherein the expandable region expands in an essentially cylindrical manner.

8. A device according to claim 1 wherein the expandable region is preformed by the application of heat and pressure.

9. A device comprising

an expandable structure preformed with a normally expanded shape and being expandable beyond its normally expanded shape to a reach an inflation volume sized and configured for manipulating bone, the structure having a wall material peripherally defining an interior space, the wall material being resistant to abrasion by cancellous bone,

the structure having a proximal and a distal end,

the structure further having a first expandable region located near the distal end and a second expandable region located proximally of the first expandable region, the first and second expandable regions separated by a third region of the structure, the third region having a reduced cross-sectional area as compared to the cross-sectional areas of the first and second regions when the structure is in the normal expanded shape and at the inflation volume, and

the first expandable region, the second expandable region, and the third expandable region further having, respectively, a first preformed average wall thickness, a second preformed average wall thickness, and a third preformed average wall thickness, and

the third average wall thickness being greater than either the first average wall thickness or the second average wall thickness when the structure is in the normal expanded shape and at the inflation volume.

10. A device according to claim 9 wherein the wall material of the first expandable region substantially surrounds a first maximum cross-sectional area of the interior space, the wall material of the

16

second expandable region substantially surrounds a second maximum cross-sectional area of the interior space, and the wall material of the third region substantially surrounds a minimum cross-sectional area of the interior space, the first and second maximum cross-sectional areas each being larger than the minimum cross-sectional area.

11. A device according to claim 9 wherein the wall material comprises polyurethane.

12. A device according to claim 9 wherein the expandable structure is preformed by the application of heat and pressure.

13. A device comprising

a wall made from a flexible material resistant to abrasion by cancellous bone, the wall peripherally defining an interior space and including an expandable region preformed with a normally expanded shape and being expandable beyond its normally expanded shape to a reach an inflation volume sized and configured for compacting cancellous bone,

the expandable region having proximal and distal ends,

the expandable region further having a first expanded section adjacent the distal end, a second expanded section located proximally of the first expanded section, and a third section located between the first and second expanded sections,

wherein the average outer diameter of the third section is less than the average outer diameter of either of the first or second expanded sections when the structure is in the normal expanded shape and at the inflation volume, and

the first expandable section, the second expandable section, and the third expandable section further having, respectively, a first preformed average wall thickness, a second preformed average wall thickness, and a third preformed average wall thickness, and

the third average wall thickness being greater than either the first average wall thickness or the second average wall thickness when the structure is in the normal expanded shape and at the inflation volume.

14. A device according to claim 13 wherein the expandable region expands in response to introduction of a flowable material into the interior space.

15. A device according to claim 13 wherein the expandable region is preformed by the application of heat and pressure.

*   *   *   *   *





## PROPRIETARY INFORMATION AGREEMENT

As a condition of my employment with Kyphon Inc., its subsidiaries, affiliates, successors or assigns (the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1.    **At-Will Employment**. I understand and acknowledge that my employment with the Company is for an unspecified duration and constitutes "at-will" employment. I acknowledge that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or myself, with or without notice.

2.    **Confidential Information**.

(a)    **Company Information**. I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company. I understand that "Confidential Information" means any of the Company's proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment. I further understand that Confidential Information does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

(b)    **Former Employer Information**. I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c)    **Third Party Information**. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold

Kyphon Inc.    |    3110 Coronado Drive    |    Santa Clara, CA    |    95054    |    Ph 408-727-9622    |    F 408-727-9623

all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3.   **Inventions**.

(a)   **Inventions Retained and Licensed**. I have attached hereto, as <u>Exhibit A</u>, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company (collectively referred to as "Prior Inventions"), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions. If in the course of my employment with the Company, I incorporate into a Company product, process or machine a Prior Invention owned by me or in which I have an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or machine.

(b)   **Assignment of Inventions**. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "Inventions"), except as provided in Section 3(f) below. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectible by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

(c)   **Inventions Assigned to the United States**. I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

(d)   **Maintenance of Records**. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

(e)    **Patent and Copyright Registrations**. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

(f)    **Exception to Assignments**. I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B). I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A.

4.    **Conflicting Employment**. I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations to the Company.

5.    **Returning the Company Documents**. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its

successors or assigns. In the event of the termination of my employment, I agree to sign and deliver the "Termination Certification" attached hereto as <u>Exhibit C</u>.

6.     <u>**Notification of New Employer**</u>. In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

7.     <u>**Solicitation of Employees**</u>. I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

8.     <u>**Conflict of Interest Guidelines**</u>. I agree to diligently adhere to the Conflict of Interest Guidelines attached as <u>Exhibit D</u> hereto.

9.     <u>**Representations**</u>. I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

10.     <u>**Arbitration and Equitable Relief**</u>.

(a)     <u>**Arbitration**</u>. Except as provided in Section 10(b) below, I agree that any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement, shall be settled by arbitration to be held in San Francisco County, California, in accordance with the rules then in effect of the American Arbitration Association. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction. The Company and I shall each pay one-half of the costs and expenses of such arbitration, and each of us shall separately pay our counsel fees and expenses.

(b)     <u>**Equitable Remedies**</u>. I agree that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in Sections 2, 3, and 5 herein. Accordingly, I agree that if I breach any of such Sections, the Company will have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific

performance of any such provision of this Agreement. I further agree that no bond or other security shall be required in obtaining such equitable relief and I hereby consent to the issuance of such injunction and to the ordering of specific performance.

11.    **General Provisions**.

(a)    **Governing Law; Consent to Personal Jurisdiction**. This Agreement will be governed by the laws of the State of California. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

(b)    **Entire Agreement**. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

(c)    **Severability**. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d)    **Successors and Assigns**. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.


_Lenny Phan_____          _04/05/0000_
Signature                                              Date

_LENNY CHI PHAN_____
Name of Employee (typed or printed)

## EXHIBIT A

## LIST OF PRIOR INVENTIONS
## AND ORIGINAL WORKS OF AUTHORSHIP

Identifying Number
_____Title_____     _____Date_____                    _or Brief Description_

_____ No inventions or improvements

_____ Additional Sheets Attached

Signature of Employee: _Lenny Chi Phan_

Print Name of Employee: _LENNY CHI PHAN_

Date: _04/05/2000_

## EXHIBIT B

### CALIFORNIA LABOR CODE SECTION 2870
### EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS

"(b)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2)    Result from any work performed by the employee for the employer.

(c)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

## EXHIBIT C

## KYPHON INC.
## TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Kyphon Inc., its subsidiaries, affiliates, successors or assigns (the "Company").

I further certify that I have complied with all the terms of the Company's Employment Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Employment, Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not hire any employees of the Company and I will not solicit, induce, recruit or encourage any of the Company's employees to leave their employment.

Date:


(Employee's Signature)


(Type/Print Employee's Name)

## EXHIBIT D

## KYPHON INC.

## CONFLICT OF INTEREST GUIDELINES

It is the policy of the Company to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees and independent contractors must avoid activities which are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations which must be avoided. Any exceptions must be reported to the President and written approval for continuation must be obtained.

1.    Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The Employment, Confidential Information and Invention Assignment Agreement elaborates on this principle and is a binding agreement.)

2.    Accepting or offering substantial gifts, excessive entertainment, favors or payments which may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.    Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.    Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.    Initiating or approving any form of personal or social harassment of employees.

6.    Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.    Borrowing from or lending to employees, customers or suppliers.

8.    Acquiring real estate of interest to the Company.

9.     Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10.    Unlawfully discussing prices, costs, customers, sales or markets with competing companies or their employees.

11.    Making any unlawful agreement with distributors with respect to prices.

12.    Improperly using or authorizing the use of any inventions which are the subject of patent claims of any other person or entity.

13.    Engaging in any conduct which is not in the best interest of the Company.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

## KYPHON INC.

## TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Kyphon Inc., its subsidiaries, affiliates, successors or assigns (the "Company").

I further certify that I have complied with all the terms of the Company's Employment Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Employment, Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

_LENNY  CHI  PHAN_                    _2/28/05_
**Print Name**                                      **Date**


_[signature]_
**Signature**